**In re Brenda L. HOPKINS, Respondent.**

**A Member of the Bar of the District of Columbia Court of Appeals.**

**No. 95–BG–845.**

District of Columbia Court of Appeals.

Argued March 12, 1996.

Decided May 31, 1996.

---

Leonard H. Becker, Bar Counsel, with whom Wallace E. Shipp, Jr. was on the brief, Washington, for the Office of Bar Counsel.

Elizabeth J. Branda, Washington, for the Board on Professional Responsibility.

Brenda L. Hopkins, pro se.

Before FERREN, STEADMAN and KING, Associate Judges.

STEADMAN Associate Judge:

The principal issue to be determined in this disciplinary matter is the scope of DR 1–102(A)(5) of the former Code of Professional Responsibility, which provided that a "lawyer shall not ... [e]ngage in conduct that is prejudicial to the administration of justice." [1]

---

1. DR 1–102(A)(5) has been replaced by D.C. Rule of Professional Conduct 8.4(d), which provides that "[i]t is professional misconduct for a lawyer to ... [e]ngage in conduct that seriously interferes with the administration of justice." Con-duct prohibited by Rule 8.4(d) includes conduct prohibited under former DR 1–102(A)(5), and the case law interpreting DR 1–102(A)(5) has been incorporated into Rule 8.4(d). D.C. RULE OF PROFESSIONAL CONDUCT 8.4 cmt.

The Board on Professional Responsibility (the Board) concluded that respondent's conduct did not violate that provision and dismissed the petition against respondent. Bar Counsel took an exception to this court. Interpreting our precedents relating to former DR 1–102(A)(5) somewhat differently than the Board did, we hold that respondent violated that provision as charged. We therefore vacate the Board's order of dismissal and remand the matter for further proceedings.

## I.

Irene Akins died intestate.[2] Her son, Robert Akins, Jr., was appointed personal representative of the estate, and retained respondent as his attorney. The only other beneficiary of the estate was Robert Akins, Sr. By statute, Akins, Sr. was entitled to receive a $10,000 family allowance plus a one-third share of the net proceeds of the estate, while Akins, Jr. was entitled to a two-thirds share of the net proceeds of the estate. *See* D.C.Code §§ 19–101, 19–301 *et seq.* (1989 Repl.).

The estate's major asset was a house, which Akins, Jr. intended to sell. To do so, he was required by statute either to increase the bond he had posted as personal representative by an amount equal to the fair market value of the property, or to obtain a waiver from Akins, Sr. of the bond requirement. *See* D.C.Code §§ 20–502(a), 20–742(b) (1989 Repl.). Respondent wrote to attorney Q. Russell Hatchl, who had been retained by Akins, Sr. to represent him in the probate matter, requesting Akins, Sr.'s consent to the sale of the decedent's home and waiver of the bond requirement. Hatchl informed respondent that Akins, Sr. would not provide the consent and waiver unless respondent gave written assurance that she would ensure proper disbursement of the sale proceeds. Hatchl suggested that respondent be a required cosignatory on the account established to hold the proceeds. Respondent agreed, and wrote to Hatchl,

> You may be assured that all proceeds from the sale shall be under joint control. Any estate account established will require both my signature and that of the personal representative. Assuming this will satisfy your client, please forward the consent to the sale at your earliest convenience.

Akins, Sr. subsequently consented to the sale of the house and waived the bond requirement.

In October 1987, after the house was sold, respondent and her client attempted to open a joint account for the sale proceeds, which amounted to approximately $46,000. The bank chosen by respondent's client would not permit a joint account arrangement, so they opened an account in the estate's name, with Akins, Jr. as the only required signatory. Respondent retained the account checkbook and arranged for the account statements to be sent to her. She and Akins, Jr. agreed that they would transfer the funds to a joint account in another bank later. Despite efforts by respondent to have Akins, Jr. fulfil the agreement, no joint account was ever established. Respondent did not advise Hatchl or Akins, Sr. about the failure to establish a joint account.

Upon receiving an account statement in January 1988, respondent discovered that her client had been withdrawing funds from the estate account without her knowledge or permission. Respondent confronted her client about the withdrawals, and he instructed her not to inform his father about them. In December 1987, Hatchl had written to respondent three times to inquire about Akins, Jr.'s apparent new wealth; respondent did not reply. Akins, Jr. continued to make withdrawals, and eventually stopped returning respondent's telephone calls. In July 1988, respondent consulted the chairman of the probate section of the D.C. Bar, who advised her that, if she was unable to convince her client to rectify the situation, she could contact the Register of Wills in the Probate Division of Superior Court about the matter and seek a court order to freeze the account.

Respondent inquired at the bank where the estate account had been established about freezing the account, and she was told that the account could not be frozen without

2. With one exception, *see* note 3, *infra,* the relevant facts are not in dispute.

a court order. Respondent did not seek a court order to freeze the account. Instead, in August 1988, after learning that the estate account balance had fallen to $25,325, respondent met with the Register of Wills. According to respondent, she informed the Register of the situation, and said that she was afraid that her client "was going to embark on some illegal [conduct] if the withdrawals of this account continue[d]." Respondent was under the impression that the Register planned to advise the probate judge of the matter and request an immediate hearing for the removal of Akins, Jr. as personal representative.[3] Despite respondent's impression that the Register would request an immediate hearing, the months of September, October, and November 1988 passed by without any sign of a hearing, and respondent received account statements indicating that Akins, Jr. was continuing to withdraw funds from the account at the rate of thousands of dollars per month. The account balance was $23,156 at the end of August, $20,868 at the end of September, $16,213 at the end of October, and $9,393 at the end of November. Nevertheless, respondent took no further action.

Finally, in December 1988, at the initiation of the Register,[4] a show cause hearing was scheduled on why Akins, Jr. should not be removed as the estate's personal representative. Akins, Jr. did not appear at the January 1989 hearing, where it was revealed that the estate balance had fallen to zero. The court removed Akins, Jr. as personal representative, and subsequently referred the account to an auditor-master. The auditor-master's report concluded that, in addition to Akins, Sr.'s one-third share of the net proceeds of the estate, Akins, Sr. was due $14,775 to cover the family allowance and reimburse him for administrative expenses.

Akins, Sr. brought a civil action against Akins, Jr., respondent, and respondent's law partner, alleging, *inter alia,* breach of contract with regard to the assurance about the joint account, conversion on the part of Akins, Jr., and, in essence, legal malpractice on the part of respondent. In April 1991, the trial court entered judgment against all defendants, jointly and severally, for an amount equal to the $10,000 family allowance, $4,775 in administrative costs, and $16,368 (which represented Akins, Sr.'s one-third share of what the net estate proceeds would be but for Akins, Jr.'s malfeasance), plus interest. Respondent and her partner appealed.[5]

In May 1993, this court decided respondent's appeal in the civil case, reversing the judgment against her and her partner. *Hopkins v. Akins,* 637 A.2d 424 (D.C.1993). We held that when respondent gave Hatchl assurance that a joint account would be established, she acted solely as an employee of Akins, Jr. rather than in her individual capacity, and therefore she was not liable on the agreement. *Id.* at 427. We further held that respondent could not be liable to Akins, Sr. for legal malpractice because she represented Akins, Jr. rather than the estate or Akins, Sr. *Id.* at 428–30.

Meanwhile, in September 1992, Bar Counsel instituted formal disciplinary proceedings against respondent, alleging that her failure to act while her client depleted the estate account violated five disciplinary rules of the former Code of Professional Responsibility. Bar Counsel subsequently withdrew three of the charges against respondent, leaving in place charges that respondent violated two rules of conduct:

DR 1–102(A)(5): "A lawyer shall not . . . [e]ngage in conduct that is prejudicial to the administration of justice," and

---

3. The Register of Wills, who testified before the Hearing Committee in this matter, provided a different version of her meeting with respondent. According to the Register, respondent supplied no definite indication of misappropriation, and did not ask the Register to take any action. The Hearing Committee did not resolve the conflict between the Register's version of the meeting and respondent's, concluding that, whatever the nature of the August 1988 meeting, respondent engaged in misconduct by failing to follow up on the meeting. For purposes of this opinion, we

accept respondent's version of the meeting as accurate.

4. The Register did not explain to the Hearing Committee what prompted her to act at that time.

5. Akins, Jr., who failed to appear in the civil action and had a default judgment entered against him, was not a party to the appeal.

DR 2–110(B)(2): "A lawyer ... shall withdraw from employment, if ... [she] knows or it is obvious that [her] continued employment will result in violation of a Disciplinary Rule."

The Hearing Committee concluded that respondent had violated both rules, and recommended a public censure. However, the Board dismissed all charges, concluding that respondent's conduct did not violate DR 1–102(A)(5), and therefore that respondent's failure to withdraw did not violate DR 2–110(B)(2).[6] Bar Counsel filed an exception to the Board's order of dismissal pursuant to D.C. Bar R. XI § 9(f), which provides that when the Board dismisses a petition, "the attorney or Bar Counsel, or both, may file with the Court exceptions to the Board's decision." Under D.C. Bar R. XI § 9(g)(1), upon the filing of such exception, "the Court shall schedule the matter for consideration in accordance with applicable court procedures."

## II.

In concluding that respondent's conduct was not "prejudicial to the administration of justice," the Board noted that "violations of DR 1–102(A)(5) have almost always involved two elements: first, knowledge on the part of the attorney of the court procedures that he or she failed to obey, and second, a resultant interference with the judicial decision-making process." The Board appears to have read our prior cases as requiring an attorney's conduct to satisfy both of these "elements" in order to violate DR 1–102(A)(5). Further, the Board interpreted the second "element" to mean that the attorney's conduct must "cause the court to malfunction or make an incorrect decision." Because we interpret

our case law somewhat less restrictively,[7] we conclude that respondent's conduct did fall within the prohibition of DR 1–102(A)(5).

### A.

Under DR 1–102, five broad areas of misconduct were prohibited, with the aim of maintaining the integrity and competence of the legal profession. *See* CODE OF PROFESSIONAL RESPONSIBILITY Canon 1. In particular, DR 1–102(A)(5) was "a general rule that [was] purposely broad to encompass derelictions of attorney conduct considered reprehensible to the practice of law." *In re Alexander*, 496 A.2d 244, 255 (D.C.1985). While DR 1–102(A)(5) was not so broad as to encompass any and all misconduct by an attorney, neither was it so narrow as the Board interpreted it. Indeed, we are aware of only three published cases in which we concluded that an attorney's conduct, charged as a violation of DR 1–102(A)(5), did not fit within the prohibition of the rule. *See In re Reynolds*, 649 A.2d 818 (D.C.1994) (conduct did not bear directly on judicial process with respect to an identifiable case or tribunal); *In re Shorter*, 570 A.2d 760 (D.C.1990) (same); *In re Thompson*, 478 A.2d 1061, 1061–62 n. 1 (D.C.1984) (respondent's isolated references to excluded evidence at trial "did not rise to the level of being prejudicial to the administration of justice").[8]

■ We do not agree with the Board that a knowing failure to obey a specific court procedure is a required element of a DR 1–102(A)(5) violation. In our prior cases, we have found violations of DR 1–102(A)(5)

6. According to the Board, the duty to withdraw under DR 2–110(B)(2) depended upon the existence of another charged "predicate" violation, and—since in the Board's view respondent did not violate DR 1–102(A)(5)—there was no such predicate violation. The Board and Bar Counsel disagree as to whether a violation of DR 2–110(B)(2) may be based on a violation of a predicate rule not specified in the charging document. In light of our holding that respondent's conduct violated DR 1–102(A)(5), with which she was formally charged, we do not reach this issue.

7. "Ultimately this court, not the Board, decides the meaning of the rules this court has adopted." *In re Robertson*, 612 A.2d 1236, 1242 (D.C.1992).

8. This does not include any cases in which Bar Counsel charged a violation of DR 1–102(A)(5), but failed to present clear and convincing evidence of such a violation. *See, e.g., In re Washington*, 489 A.2d 452, 456–58 (D.C.1985). The issue in such cases was the sufficiency of the evidence rather than whether the charged conduct fit within the rule's prohibition.

where there was no apparent disobedience of a specified court procedure. *See, e.g., In re Sablowsky,* 529 A.2d 289 (D.C.1987) (attempting to sell information to other attorneys to be used as factual evidence in a case); *In re (Dorothy) Jones,* 521 A.2d 1119 (D.C. 1986) (per curiam) (failing to respond to Bar Counsel's legitimate written inquiries); *In re Keiler,* 380 A.2d 119 (D.C.1977) (per curiam) (procuring interested person to act as ostensibly neutral arbitrator), *overruled in part on other grounds, In re Hutchinson,* 534 A.2d 919, 927 (1987) (en banc). Moreover, in *In re L.R.,* 640 A.2d 697 (D.C.1994), we declined to adopt a scienter requirement for DR 1–102(A)(5) and concluded that the conduct of the respondent in that case was prejudicial to the administration of justice "whether [it] was reckless or somewhat less blameworthy." *Id.* at 701.

■ We also do not agree that a DR 1–102(A)(5) violation requires interference with the judicial decision-making process that causes the court to malfunction or make an incorrect decision. As we have said previously, DR 1–102(A)(5) prohibited "conduct which taints the decision making process," even if such conduct "fosters a correct decision." *Keiler, supra,* 380 A.2d at 125; *see also In re Reback,* 487 A.2d 235, 239 (D.C. 1985) (per curiam) (attorneys violated DR 1–102(A)(5) by forging client's signature on complaint, even though facts and arguments in forged version were identical to those in previous version validly signed by client), *affirmed in relevant part,* 513 A.2d 226, 229 (D.C.1986) (en banc).

■ Furthermore, a DR 1–102(A)(5) violation does not require interference specifically with the judicial *decision-making* process. In *Shorter, supra,* a case involving willful tax evasion by an attorney, we explained that "DR 1–102(A)(5) was drafted to protect the integrity of particular decisions and of the decision-making process, and thus was directed against an attorney's efforts to sub-

vert that process respecting a particular identifiable case or tribunal." 570 A.2d at 768.[9] However, *L.R.,* a subsequent case, makes clear that an attorney's improper conduct can be prejudicial to the administration of justice not only by bearing directly on the judicial decision-making function, but also by bearing directly on the judicial process in general. In *L.R.,* the respondent, who was appointed counsel for an indigent criminal defendant pursuant to the Criminal Justice Act (CJA), negotiated with his client to file a motion in return for payment from the client. Although it could not reasonably be said that such conduct bore directly on the court's decision or decision-making process, we concluded that respondent's conduct violated DR 1–102(A)(5) because it was "presumptively prejudicial to the administration of the CJA system, if for no other reason than because of the belief it likely will instill in the defendant that the quality of his representation may yet depend upon gathering together funds to compensate the attorney whom he has not selected." *Id.* at 701 (internal quotation omitted).

In *Reynolds, supra,* we agreed with the uncontested conclusion of the Board that no DR 1–102(A)(5) violation occurred when the respondent, an attorney who was serving a sentence of probation for criminal contempt, violated a condition of his probation by using illegal drugs. Although the respondent's conduct in *Reynolds* happened to violate the court's probation order and caused the court to revoke his probation, the conduct was engaged in as part of respondent's personal life, apart from any identifiable proceeding, and the conduct in and of itself was not directed to the judicial process as such. 649 A.2d at 822–23.

■ Our reading of *Shorter, L.R., Reynolds,* and our other DR 1–102(A)(5) cases leads us to conclude that, in order to be prejudicial to the administration of justice, an attorney's conduct must meet the following criteria. First, of course, the conduct must

---

9. The respondent in *Shorter* did not violate the rule when he willfully evaded and failed to pay his taxes because his conduct "did not bear directly upon any decision or the decision-making process of any tribunal." *Id.*

be improper. That is, the attorney must either take improper action or fail to take action when, under the circumstances, he or she should act. *See, e.g, Reback, supra,* 487 A.2d at 239 (improper action); *Jones, supra,* 521 A.2d at 1121 (failure to act). This conduct may be improper, for example, because it violates a specific statute, court rule or procedure, or other disciplinary rule, but, as here, it may be improper simply because, considering all the circumstances in a given situation, the attorney should know that he or she would reasonably be expected to act in such a way as to avert any serious interference with the administration of justice. Second, as explained in *Shorter* and clarified in *L.R.,* the conduct itself must bear directly upon the judicial process (*i.e.,* the "administration of justice") with respect to an identifiable case or tribunal. This of course will very likely be the case where the attorney is acting either as an attorney or in a capacity ordinarily associated with the practice of law. *Compare In re Goffe,* 641 A.2d 458, 466 (D.C. 1994) (attorney's fabrication and alteration of evidence in two cases violated DR 1–102(A)(5), even though in one of the cases he acted not as an attorney but as a party, because presentation of evidence is "within the familiar arena of attorneys") *and Sablowsky, supra,* 529 A.2d at 293 (respondent violated DR 1–102(A)(5) by attempting to sell information to other attorneys to be used as factual evidence in a case in which respondent was not otherwise involved); *with Reynolds, supra,* 649 A.2d at 822–23 (attorney's personal drug use did not violate DR 1–102(A)(5)). And third, the attorney's conduct must taint the judicial process in more than a *de minimis* way; that is, at least potentially impact upon the process to a serious and adverse degree. *See Thompson, supra,* 478 A.2d at 1061–62 n. 1.

We have found violations of DR 1–102(A)(5) in various situations that meet these criteria. *See, e.g., In re Delate,* 598 A.2d 154 (D.C.1991) (failing, as conservator, to appear at hearing, file required accountings, and respond to inquiries of Bar Counsel); *In re Sandground,* 542 A.2d 1242 (D.C. 1988) (per curiam) (assisting client in divorce case to conceal assets); *Jones, supra,* 521 A.2d at 1121 (failing to respond to Bar Counsel's legitimate written inquiries in connection with investigation of respondent's conduct as conservator)[10]; *Reback, supra,* 487 A.2d at 238–39 (forging signature on pleading); *In re Burka,* 423 A.2d 181 (D.C.1980) (en banc) (failing, as removed conservator, to turn over estate assets promptly and to submit bank statements to auditor); *Keiler, supra,* 380 A.2d at 125 (causing law partner to act as an ostensibly neutral arbitrator between respondent's client and the client's employees, thereby denying opposing party "the services of an impartial judicial officer" and "perpetrating . . . a fraud on the judicial system").

## B.

■ Applying the above criteria to the facts at hand, we conclude that respondent violated DR 1–102(A)(5). After meeting with the Register of Wills in August 1988, respondent failed to take any further action to protect the estate assets from her client's looting, all the while knowing that Akins, Sr. had waived the statutory bond requirement in reliance on the promise to place the funds under joint control, and that this promise remained unfulfilled.

In respondent's view, she had no knowledge that her client had withdrawn more than his share of funds until she learned, sometime in December, that the account balance had fallen to $9,393, and by that time,

---

**10.** Although the office of Bar Counsel is not properly characterized as a "tribunal," *see Shorter, supra,* 570 A.2d at 768, it is an integral part of the disciplinary system established by this court, *see* D.C. Bar R. XI § 6, and an investigation by Bar Counsel is thus part of the judicial process.

*Cf. In re Siegel,* 635 A.2d 345, 346 (D.C.1993) (per curiam) (respondent violated Rule 8.4(d), successor to DR 1–102(A)(5), by "seriously interfer[ing] with the efficient administration of the disciplinary system") (internal quotation omitted).

there was no reason for her to follow up on her meeting with the Register because the court had already scheduled the show cause hearing on Akins, Jr.'s removal. Neither the Board nor the Hearing Committee made findings of fact with regard to the precise point at which Akins, Jr. could be considered to have withdrawn more than his share of the estate funds, the point at which, at the latest, respondent was compelled to take action.[11] Nevertheless, respondent's view that this point did not occur until the account balance fell to $9,393 is belied by the record, which demonstrates that Akins, Sr. was entitled to $14,775 of the funds, in addition to his one-third share of the net estate proceeds.[12] By the end of October 1988, the account balance had fallen to $16,213, a sum that would have been far too low to cover $14,775 plus Akins, Sr.'s one-third share.[13]

By the time respondent received the October bank statement, if not earlier,[14] it was obvious that her client had withdrawn more than his share of the funds. At that point, given respondent's knowledge that the statutorily required bond (which would have protected the estate from such a loss) had been waived by Akins, Sr. in reliance on the unfulfilled assurance that Akins, Jr. would establish a joint account, it was incumbent upon respondent not just to hope that the Register of Wills would take action, but to follow up on her earlier contact with the Register in an effort to ensure that appropriate action would indeed be taken.[15] By failing to act after that point, respondent not only prejudiced, but destroyed, the Probate Division's ability to administer the estate assets.[16] Respondent's inaction constituted improper conduct that arose directly out of her employment as attorney for the personal representative in an identifiable proceeding in

11. The only such finding made was that this point did not occur until sometime after July 29, 1988.

12. That Akins, Sr. was entitled to $14,775 in addition to one-third of the net proceeds should have come as no surprise to respondent. Although there was a dispute with regard to whether the $10,000 family allowance due Akins, Sr. had been satisfied, and if not, whether it was payable from the proceeds of the house sale, respondent knew by June 1988 that there was at least a possibility that Akins, Sr. was entitled to receive the allowance from the proceeds. In addition, respondent was or should have been aware of Akins, Sr.'s claims against the estate for administrative expenses, filed in March 1988. In August 1988, the Probate Division ordered that the estate reimburse Akins, Sr. for $4,150 of his claimed expenses; an additional amount was ordered in December 1988.

13. By any conceivable account, Akins, Sr.'s one-third share of the net proceeds of the estate would have far exceeded $1,438 (the difference between $16,213 and $14,775). As discussed above, the trial court in the civil case found that Akins, Sr.'s one-third share alone amounted to over $16,000.

14. We therefore need not explore further whether respondent had a duty to take action at some prior point.

15. Respondent argued to the Hearing Committee that revealing information about her client's withdrawals would have violated DR 4–101(B), which provided that, "[e]xcept when permitted under DR 4–101(C), a lawyer shall not knowingly ... [r]eveal a confidence or secret of [her] client." However, according to respondent's own testimony discussed above, she had already revealed this information to the Register of Wills. Moreover, we agree with the Hearing Committee that such a revelation would appear to fall within the exception of DR 4–101(C)(3), which permitted a lawyer to reveal "the intention of [her] client to commit a crime and the information necessary to prevent the crime," thereby removing any restriction that otherwise might have been imposed upon respondent by DR 4–101(B). *See* D.C.Code § 22–3811 (1989 Repl.) (one who "mak[es] an unauthorized use, disposition, or transfer of an interest in or possession of property ... of another with intent ... [t]o deprive the other of a right to the property or a benefit of the property ... or ... [t]o appropriate the property to his or her own use" commits the crime of theft).

16. While the personal representative has various powers with regard to administration of the estate, *see* D.C.Code § 20–741 (1989 Repl.), the personal representative is judicially appointed and is subject to the court's authority, and estate distribution is a judicial function. *See Godette v. Estate of Cox*, 592 A.2d 1028, 1033 (D.C.1991); *Richardson v. Green*, 528 A.2d 429, 430–31 (D.C. 1987).

the Probate Division. Her conduct bore directly on, and seriously and adversely impacted, the judicial process with respect to that proceeding. Respondent's conduct therefore fell within the prohibition of DR 1–102(A)(5).

Accordingly, the Board's order of dismissal is vacated, and the matter is remanded to the Board for further proceedings consistent with this opinion.[17]

*So ordered.*

17. As already indicated, respondent was also charged with violating DR 2–110(B)(2) by failing to withdraw from her representation of Akins, Jr. Respondent presented defenses to this charge that were rejected by the Hearing Committee, but were not considered by the Board due to the Board's disposition of the charges. *See* note 6, *supra.* Rather than deciding the issue without the benefit of the Board's judgment, we leave it for the Board to consider on remand whether respondent violated DR 2–110(B)(2). In addition, the Board on remand should recommend an appropriate sanction for respondent's disciplinary violation or violations.