In re: Arthur D. MASON, Respondent.

A Member of the Bar of the
District of Columbia.

Nos. 90–BG–998 & 93–BG–367.

District of Columbia Court of Appeals.

Argued April 20, 1999.
Decided Sept. 2, 1999.

John T. Kotelly, Washington, DC, for respondent.

Leonard H. Becker, Bar Counsel, for the Office of Bar Counsel.

Before STEADMAN and FARRELL, Associate Judges, and MORRISON, Associate Judge, Superior Court of the District of Columbia.*

MORRISON, Associate Judge:

This case is before us on exceptions to the Report and Recommendation of the Board on Professional Responsibility (the Board) recommending that Arthur D. Mason be disbarred from the practice of law in the District of Columbia. The Board found grounds for disbarment predicated on D.C.Code § 11–2503(a) (1995)[1] and vio-

---

* Sitting by designation pursuant to D.C.Code § 11–707(a) (1995).

1. D.C.Code § 11–2503(a) states:
   When a member of the bar of the District of Columbia Court of Appeals is convicted of an offense involving moral turpitude, and a certified copy of the conviction is presented to the court, the court shall, pending final determination of an appeal from the conviction suspend the member of the bar from

lations of the former Code of Professional Responsibility, including DR 1–102(A)(3), DR 1–102(A)(4), and DR 1–102(A)(5).[2] The Board recommends further that such disbarment be imposed *nunc pro tunc* to April 23, 1993, and that Docket No. 93–BG–367, a reciprocal discipline case from the Massachusetts Bar, be dismissed in light of respondent's disbarment under D.C.Code § 11–2503(a). We agree.

Hearing Committee Number Three and the Board both concluded that respondent violated D.C.Code § 11–2503(a) and the three disciplinary rules by engaging in a complex series of business dealings with John Galanis, a convicted felon, and various Galanis-controlled entities over a period of several years. On the basis of these dealings, respondent was convicted in the Supreme Court of the State of New York for the misdemeanor offense of second degree offering a false instrument for filing. Subsequently, respondent was suspended from the practice of law in Massachusetts for three years.

We review the Board's recommendation in accordance with D.C. Bar R. XI, § 9(g) (1998), which states that "the Court shall accept the findings of fact made by the Board unless they are unsupported by substantial evidence of record, and shall adopt the recommended disposition of the Board unless to do so would foster a tendency toward inconsistent dispositions for comparable conduct or otherwise would be unwarranted."

The specific conduct on which the Board's conclusions are based is described in thoughtful detail in the reports submitted by both the Hearing Committee and the Board. We conclude that the Board's findings of fact are supported by substantial record evidence, and we adopt the Board's recommendations. The relevant portion of the Board's Report and Recommendation is attached hereto as an Appendix. There are, however, three specific issues that merit further discussion.

## I.

The first issue involves respondent's argument that the Board wrongly assessed the impact of the Hearing Committee's erroneous statement that "Respondent admitted to intentional fraud," (Hrg. Comm. Rpt. at 73), in his plea before the New York Supreme Court. In what he views as the primary defect in the Board's recommendation, respondent argues that this erroneous statement tainted the Hearing Committee's entire view of the evidence in such a way as to make accurate fact-finding on its part impossible.

Respondent was originally indicted in the Supreme Court of New York for an offense requiring proof of a specific intent to defraud. He pleaded guilty to a lesser included offense—that of offering a false instrument for filing in the second degree. This misdemeanor offense does *not* require proof of a specific intent to defraud. While it is true that the Hearing Committee's report does include the statement about respondent's guilty plea that he objects to, it also contains numerous, detailed findings of respondent's wrongdoing. It is clear from the first page of the Hearing Committee's report that it knew the crime respondent had been found

practice. Upon reversal of the conviction, the court may vacate or modify the suspension. If a final judgment of conviction is certified to the court, the name of the member of the bar so convicted shall be struck from the roll of the members of the bar and such person shall thereafter cease to be a member. Upon the granting of a pardon to a member so convicted, the court may vacate or modify the order.

**2.** Bar Counsel charged respondent with the following:

DR 1–102(A)(3), in that Respondent engaged in illegal conduct involving moral turpitude that adversely reflects on his fitness to practice law;
DR 1–102(A)(4), in that Respondent engaged in conduct involving dishonesty, fraud, deceit, or misrepresentation; and
DR 1–102(A)(5), in that Respondent engaged in conduct prejudicial to the administration of justice.
(Hrg. Comm. Rpt. at 2.)

guilty of in the New York matter did not involve moral turpitude *per se.* Because of this fact, the Hearing Committee realized that its task was to analyze the underlying facts and circumstances of respondent's conduct in order to determine whether this conduct did, in fact, rise to the level of moral turpitude. The Board's report indicates clearly that the incorrect statement in the Hearing Committee's report should be disregarded, and states further that it "does not believe that this language in the report is in any way determinative of the outcome in these matters. Bar Counsel's evidence of other fraudulent and dishonest activities is overwhelming and firmly supports the Hearing Committee's recommendation of disbarment." (Bd. Rpt. at 7.) Given the wealth of evidence of wrongdoing by respondent documented in the lengthy record before the Hearing Committee and the Hearing Committee's detailed findings, we agree with the Board that the record as a whole contains ample evidence supporting the notion that respondent's actions constitute moral turpitude. We are not persuaded by respondent's argument that the entire process was tainted by the Hearing Committee's misstatement about the elements of his misdemeanor plea in New York, and we find that respondent should be disbarred pursuant to D.C.Code § 11–2503(a).

## II.

■ The second issue involves the alleged violation of DR 1–102(A)(5) of the former Code of Professional Responsibility.[3] Both the Hearing Committee and the Board found that respondent had violated three disciplinary rules, including DR 1–102(A)(5), and the Board concluded that these violations provide an independent rationale for imposing sanctions. (Bd. Rpt. at 13.) We accept the findings of the Board regarding DR 1–102(A)(3) ("illegal conduct involving moral turpitude that adversely reflects on [respondent's] fitness to practice law") and DR 1–102(A)(4) ("conduct involving dishonesty, fraud, deceit, or misrepresentation"). The Board's recommendation regarding the alleged DR 1–102(A)(5) violation, however, requires additional consideration.

■ DR 1–102(A)(5) states that a "lawyer shall not ... engage in conduct that is prejudicial to the administration of justice." The Hearing Committee found that respondent violated DR 1–102(A)(5) when he "lied to the FHLBB [the Federal Home Loan Bank Board], under oath, during its investigation undertaken to determine whether the agency should approve the proposed change in control application [for CFS Corporation] and whether the Respondent and others previously had formed a control group without making the requisite disclosure." (Hrg. Comm. Rpt. at 83.) The Board agreed that respondent's actions in relation to the Federal Home Loan Bank Board's (FHLBB) investigation constituted a violation of DR 1–102(A)(5). (Bd. Rpt. at 10.) We find that although respondent's conduct did not involve a court proceeding, it is appropriate nevertheless to view such conduct as prejudicial to the administration of justice.[4]

■ Our case law supports a somewhat expansive view of DR 1–102(A)(5). As we stated in *In re Alexander,* 496 A.2d

3. At the time of respondent's actions, the Disciplinary Rules of the Code of Professional Responsibility governed attorney conduct in this area. On January 1, 1991, the District of Columbia Rules of Professional Conduct came into effect, replacing the former Disciplinary Rules. DR 1–102(A)(5) was replaced by Rule 8.4(d), which proscribes "conduct that seriously interferes with the administration of justice." The Comment to Rule 8.4(d) indicates that conduct prohibited by that rule includes conduct that was prohibited by DR 1–102(A)(5), and DR 1–102(A)(5) case law has been incorporated into Rule 8.4(d). *See In re L.R.,* 640 A.2d 697, 697 n. 1 (D.C.1994); *In re Hopkins,* 677 A.2d 55 n. 1 (D.C.1996).

4. In respondent's "Exception of Respondent To The Report and Recommendation Of The Board On Professional Responsibility" [hereinafter Resp't Br.], dated October 5, 1998, counsel for respondent did not specifically challenge the viability of the DR 1–102(A)(5) violation, nor did he raise this issue at oral argument before this Court.

244 (D.C.1985), DR 1–102(A)(5) "is a general rule that is purposely broad to encompass derelictions of attorney conduct considered reprehensible to the practice of law." *Id.* at 255 (citing the Board's adopted Appendix). We have also endorsed the notion that "conduct that is prejudicial to the administration of justice" can be equated to "conduct unbecoming a member of the bar."[5] *In re Solerwitz,* 575 A.2d 287, 292 (D.C.1990) (per curiam) (citing the Board's adopted Appendix). This broad reading is supported by the aim of DR 1–102 set forth in the Code of Professional Responsibility, which is to uphold the "integrity and competence of the legal profession." *See In re Hopkins,* 677 A.2d 55, 59 (D.C.1996) (citing Canon 1 of the Code of Professional Responsibility). A DR 1–102(A)(5) violation does not require that a specific court procedure be violated, nor does it require that a judicial body make an incorrect decision. *Id.* at 59–60. Such a violation also does not have to be affiliated specifically with the judicial decision-making process; the conduct simply must bear upon the administration of justice. *Id.* at 60–61.[6]

■■■ In *Hopkins,* we utilized three criteria to ascertain whether an attorney's conduct is prejudicial to the administration of justice under DR 1–102(A)(5).[7] *Id.* First, there must be an improper action or a failure to take a proper action. *Hopkins, supra,* 677 A.2d at 60–61. Second, "the conduct itself must bear directly upon the judicial process (i.e., the 'administration of justice') with respect to an identifiable case or tribunal." *Id.* at 61. The proceeding implicated by the conduct can be either judicial or quasi-judicial in nature. *In re Keiler,* 380 A.2d 119, 123 (D.C.1977) (per curiam) (DR 1–102(A)(5) violation involving private arbitration process), *overruled in part on other grounds.* Third, the conduct must "at least potentially impact upon the process to a serious and adverse degree." *Hopkins, supra,* 677 A.2d at 61.

■■■ Applying the above criteria to respondent's behavior, it seems clear that respondent's conduct satisfies the first requirement in *Hopkins.* He lied to a regulatory oversight board under oath about his business dealings. As we said in *Hopkins,* conduct can be considered improper

> because it violates a specific statute, court rule or procedure, or other disciplinary rule, but, ... it may be improper simply because, considering all the circumstances in a given situation, the attorney should know that he or she would reasonably be expected to act in such a way as to avert any serious interference with the administration of justice.

*Id.*

As to the second *Hopkins* requirement, we must ask whether respondent's conduct had a direct effect on the "judicial process ... with respect to an identifiable case or tribunal." *Id.* In most cases, this question is a relatively simple one to answer, "where the attorney is acting either as an attorney or in a capacity ordinarily associated with the practice of law." *Id.* In this case involving respondent's actions with

---

5. The language "conduct unbecoming a member of the bar" originates from Fed. R.App. P. 46(b).

6. In *Hopkins,* we cited but three cases where attorney conduct that was alleged to be within the reach of DR 1–102(A)(5) had been determined not to fit the rule's prohibitions. These include *In re Reynolds,* 649 A.2d 818 (D.C. 1994) (per curiam) (where attorney's probation violation did not "bear directly on judicial process with respect to an identifiable case or tribunal"); *In re Shorter,* 570 A.2d 760 (D.C.1990) (where attorney's failure to pay personal income taxes did not "bear directly

on judicial process with respect to an identifiable case or tribunal"); and *In re Thompson,* 478 A.2d 1061, 1061–62 n. 1 (D.C.1984) (where respondent's repeated mention of excluded evidence did not "rise to the level of being prejudicial to the administration of justice"). *Hopkins, supra,* 677 A.2d at 59. This excludes cases where the dispositive factor was the sufficiency of the evidence as opposed to whether the respondent's actions amounted to a DR 1–102(A)(5) violation. *Id.*

7. *See also In re Drew,* 693 A.2d 1127, 1133 (D.C.1997) (adopting Board's report in Appendix).

the FHLBB, the question arises whether the former function of the FHLBB can be viewed as judicial or quasi-judicial in nature.[8]

Although none of the materials before us provides a precise definition or description of the FHLBB, the record reveals important details about its previous work.[9] The FHLBB was a federal regulatory agency. (II Tr. at 20–21).[10] It had "an interest in assuring that any acquirer or controlling person of a federal [financial] institution had high integrity and would not use or manipulate the association to the detriment of the Federal Insurance Fund." (*Id.* at 17.) At least one of the FHLBB's duties was to oversee the stock sales of certain financial institutions. (Hrg. Comm. Rpt. at 5, 14, 18; Bar Counsel's "On Exception Of Respondent To Report And Recommendation Of The Board On Professional Responsibility" [hereinafter B. Couns. Br.], dated October 29, 1998, at 4.) This oversight duty was derived from § 17.30(q) of the National Housing Act. (II Tr. at 15.) The FHLBB had the power to grant or deny stock purchase requests, and it was also able to fashion conditions that had to be adhered to in order for a party to receive purchase approval. (Hrg. Comm. Rpt. at 19; II Tr. at 15.) The FHLBB conducted investigations of financial institutions. During the course of such investigations, the FHLBB received sworn affidavits, (Hrg. Comm. Rpt. at 8), submitted questions to individuals, (*id.* at 15–16), examined the financial records of institutions, (*id.* at 34), and took depositions, (*id.* at 17). It had the power to oversee the bailout of financial institutions, (Hrg. Comm. Rpt. at 7), issue cease and desist orders, (*id.* at 37), reclassify loans, (*id.* at 38), and file civil actions against parties to prevent a violation of the "change in control provisions of federal statutes," (*id.* at 40–41).

We have upheld DR 1–102(A)(5) violations in cases that do not involve a formal court setting. In the case of *In re Hutchinson*, 534 A.2d 919 (D.C.1987) (en banc), we found a DR 1–102(A)(5) violation where respondent testified, under oath, untruthfully before the Securities and Exchange Commission regarding a personal investment. *Id.* at 919–20. In the case of *In re Keiler, supra,* 380 A.2d at 119, we held that respondent violated DR 1–102(A)(5) by selecting an interested party to serve as (what others assumed to be) a disinterested arbitrator in a private arbitration matter. We noted in *Keiler* that "harm results to the administration of justice when the conduct of a *judicial or quasi-judicial* proceeding is such as to render that proceeding a bogus one." *Id.* at 123 (emphasis added). We conclude that the FHLBB served a quasi-judicial function at the time of respondent's actions, and that respondent's conduct affected its administration in a direct way, satisfying the second requirement in *Hopkins*.

We likewise find that the third *Hopkins* requirement, that the attorney's conduct "taint the judicial process in more than a *de minimis* way," is satisfied. *Hopkins, supra,* 677 A.2d at 61. Honesty, especially in officers of the court, has always been and continues to be an indispensable component of our judicial system. As we stated in *Hutchinson:*

> Lawyers have a greater duty than ordinary citizens to be scrupulously honest *at all times,* for honesty is "basic" to the practice of law. . . . Every lawyer has a duty to foster respect for the law, and *any* act by a lawyer which shows disrespect for the law tarnishes the entire profession.

---

**8.** The FHLBB has since been abolished. *See* 12 U.S.C.A. § 1437 (Supp.1999)(repealed 1989).

**9.** For an official exposition of the former powers and duties of the FHLBB, *see* 12 U.S.C.A. § 1437 (1989) (repealed 1989).

**10.** The transcripts of the testimony and proceedings before the Hearing Committee are cited herein as "I Tr. at ___" for the proceedings on February 9, 1994; "II Tr. at ___" for February 17, 1994; and "III Tr. at ___" for March 16, 1994.

*Hutchinson, supra,* 534 A.2d at 924 (citation omitted) (emphasis added).

It is fair to say that a dishonest attorney will always negatively affect the judicial process to some degree. More specifically, however, respondent's dishonesty in this particular situation contributed to the fact that the FHLBB's decision on the stock purchase and control of CFS, a savings and loan institution, was based upon false information. As the record in this case reflects, this determination paved the way for further illicit transactions, the completion of which ultimately led to a great many innocent people losing substantial sums of money and the filing of both criminal and disciplinary charges in several jurisdictions against respondent and others. Thus, respondent's dishonesty affected the judicial process in much more than a *de minimis* way.

We find that respondent's behavior meets all three *Hopkins* criteria, and, thus, we affirm the Board's finding of a DR 1–102(A)(5) violation in this case.

■ In determining the proper sanction for all three disciplinary violations, the Board found that:

> Disbarment would also be the appropriate sanction for the disciplinary rule violations, separate and apart from the criminal conviction. The magnitude and severity of the fraud and dishonesty of these activities far exceed those involved in *In re Casalino,* 697 A.2d 11 (D.C. 1997) or *In re Goffe,* 641 A.2d 458 (D.C. 1994) (per curiam), in which the Court ordered disbarment. Respondent also derived substantial personal gain from his involvement in this [sic] activities.

(Bd. Rpt. at 13.) We agree with the Board that independent grounds exist for respondent's disbarment pursuant to violations of DR 1–102(A)(3), DR 1–102(A)(4), and DR 1–102(A)(5) of the former Code of Professional Responsibility.

### III.

■ The final issue to be determined is the effective date of respondent's disbarment. Both the Hearing Committee and the Board recommend that disbarment be imposed *nunc pro tunc* to April 29, 1993, the date when respondent filed an affidavit to comply with the requirements of *In re Goldberg,* 460 A.2d 982 (D.C.1983) (per curiam). That affidavit, *inter alia,* asserted that respondent had not practiced law anywhere since March 1990, and, specifically, that he would not practice law in the District of Columbia until the matter was resolved. Bar Counsel joins in recommending *nunc pro tunc* treatment. Although the 1993 affidavit may not have complied in all respects with the additional requirements of D.C.App. R. XI, § 14, it was not until *In re Slosberg,* 650 A.2d 1329 (D.C.1994), that we discussed in detail the interrelation between that provision and *Goldberg.* Given the pre-*Slosberg* aspect of this proceeding, coupled with the other particular circumstances of this case, we will accept the unanimous recommendation that *nunc pro tunc* effect be given to the disbarment.

### IV.

Based on the foregoing reasons and the entire record herein, we adopt the Board's recommendations that in Docket No. 90–BG–998 Arthur Mason be disbarred from the practice of law in the District of Columbia pursuant to D.C.Code § 11–2503(a) and DR 1–102(A)(3), DR 1–102(A)(4), and DR 1–102(A)(5) of the former Code of Professional Responsibility, *nunc pro tunc* to April 29, 1993. We further order that the reciprocal case, Docket No. 93–BG–367, be dismissed.

*So ordered.*

### APPENDIX

### DISTRICT OF COLUMBIA COURT OF APPEALS BOARD ON PROFESSIONAL RESPONSIBILITY

In the Matter of

ARTHUR D. MASON,

Respondent.

Bar Docket No. 295–90 & 111–93

\* \* \* \*

This proceeding centers around the Respondent's involvement in the activities of John P. Galanis, a convicted felon, who used a series of attorneys, accountants and bankers to "aid his scheme to defraud the investing public. Mr. Galanis... was the mastermind of a complex conspiracy" which resulted in the loss of millions of dollars.[3] (Brief In Support of Respondent's Objections To the Report of Hearing Committee Number Three at 2, hereinafter "Respondent's Brief").[4]

There is an intricate web of Galanis-related fraudulent activities which span over a decade. The critical question is whether Respondent was an "unwitting" tool of Mr. Galanis, as he contends, or whether he deliberately engaged in a variety of fraudulent and deceptive activities which were calculated to reap substantial financial gain for himself as well as benefit the Galanis enterprises. The Hearing Committee concluded that Bar Counsel had established the second alternative, based in part on Respondent's criminal conviction, and in part, on a protracted series of activities and transactions in which Respondent himself engaged over a period of at least four years. Those activities are catalogued at pages 76 to 81 of the Hearing Committee Report.

John Galanis was convicted of securities fraud in 1972. Respondent met him in 1977 when Respondent was a partner at Dickstein, Shapiro & Morin ("DSM"). Respondent brought Galanis to the firm for tax advice and other legal representation.

Galanis told Respondent of his criminal conviction and incarceration, and senior partners of the firm conducted interviews before accepting him as a client. Mr. Galanis became a client and referred a number of other clients to the firm until 1983, when Respondent and two associates, Richard Perrin and Helen Kanovsky, left the firm to form a new partnership with a West Coast law firm, Leff & Stephenson. The new firm was called Leff & Mason. Galanis and his related clients were important clients, and all of the Washington, D.C. office attorneys performed legal work for Galanis-related entities, including the National (or Nashua) Trust Company ("NATCO"), Consolidated Mortgage Corporation, Noram Secured Income (Norsec), Heartwell, and County Federal Savings and Loan Association ("County Federal"). This work included tax advice and incorporation of various entities, as well as the preparation of Private Placement Memoranda ("PPM") or disclosure statements for real estate offerings of the Galanis-related enterprises.

In 1986, Respondent and his two partners formed their own firm, Mason Perrin & Kanovsky ("MPK"). Galanis and his various entities were the primary clients of the MPK firm, with NATCO paying the firm a retainer of $25,000 a week. Respondent and his partners received over $5,000,000 from Galanis and Galanis-controlled entities. The firm disbanded in 1986 when Galanis and his various enterprises were investigated and prosecuted by federal authorities.

Respondent was indicted in 1987 in the United States District Court for the Southern District of New York, along with Galanis and other individuals. They were charged with a number of violations under the federal RICO statute; Respondent also was charged with concealing from the Federal Home Loan Bank Board (FHLBB) his relationship with Galanis in the acquisition of stock in County Federal Savings and Loan. The court dismissed the RICO counts against Respondent at the

---

3. Insurance companies for Respondent's law firms (Leff & Mason and Mason, Perrin, & Kanovsky) agreed to pay an aggregate of $8.15 million in settlement of claims on behalf of the attorney defendants, including Respondent. (Report at 46).

4. A portion of the underlying facts of this case was also the basis of a disciplinary proceeding against another attorney, Richard Perrin, who worked as an associate and later partner of Respondent. Mr. Perrin was suspended by the Court for three years. *In re Perrin,* 663 A.2d 517 (D.C.1995).

close of the government's case, and he was acquitted of the charges of concealment after a three-month jury trial.

In 1988, Respondent and his partner, Richard Perrin, were prosecuted in New York state court on real estate investment fraud charges that were related to the federal charges. Substantial portions of the state indictment were dismissed on double jeopardy grounds. Respondent and Richard Perrin both entered guilty pleas to misdemeanors and were sentenced to terms of imprisonment and substantial fines. As previously noted, this criminal conviction forms the basis of Bar Docket No. 295–90.

The Board does not see the need to repeat here the entirety of the factual underpinnings of the disciplinary violations in supporting the recommendation of the Hearing Committee to disbar Respondent. We rely on the Report which lays out a more complete version of the chronology of events which occurred during this general timeframe.

### Respondent's Exceptions

Respondent first objects to the finding of the Hearing Committee that the New York misdemeanor conviction involved an intent to defraud. Respondent asserts that in the plea proceeding, he entered a plea to a misdemeanor, which was a lesser included offense of the felony charged in the state indictment. While the original felony count did require proof of a specific intent to defraud, the misdemeanor count to which Respondent entered a plea did not involve an intent to defraud.

The Board concurs with Respondent's position. In fact, the Board reached this same conclusion regarding intent to defraud earlier in its 1991 Order, finding that the statute and Respondent's plea did not constitute moral turpitude *per se* and referring the matter to a hearing committee for a determination of whether the underlying facts and circumstances demonstrate moral turpitude.

Thus, the statement in the Report that "Respondent admitted to intentional

fraud" is incorrect and should be disregarded. (Report at 73). In recommending this, however, the Board does not believe that this language in the Report is in any way determinative of the outcome in these matters. Bar Counsel's evidence of other fraudulent and dishonest activities is overwhelming and firmly supports the Hearing Committee's recommendation of disbarment.

While the misdemeanor statute, to which Respondent pled guilty, does not involve an intent to defraud, it is worth noting that the sentencing judge in New York sentenced Respondent to the maximum period of incarceration and in doing so, noted:

This was a sophisticated, well-thought out, well-executed, well-planned scheme which successfully obtained from more than 2200 people more than $150 million, and none of it has been returned.... [It is a] scheme the magnitude of which is unparalleled. Mr. Mason had a central role ... [t]he [PPM] were beautifully done, beautifully packaged, expertly printed and prepared. [Mason] knew Galanis's role in this whole proceeding was intentionally and persistently and continuously being concealed and that if it had been revealed, it couldn't have taken place, the scheme couldn't have worked but for that concealment.

Bar Counsel Ex. 205 at 8, 29–30.

Although the Report language at one page may have been in error with respect to Respondent's admission of an intent to defraud, there is no reason to conclude, as Respondent urges, that this mischaracterization of his plea "tainted" the Hearing Committee's analysis of the underlying misconduct, given the overwhelming evidence of pervasive fraudulent endeavors by the Galanis organization, aided in no small measure by Respondent. The primary task of the Hearing Committee was to review the full context of Respondent's misconduct in order to determine whether the circumstances of the crime involved moral turpitude. The content of the Report demonstrates that the Committee had

this task clearly in mind as it fulfilled its charge. The evidence fully supports the Committee's finding of moral turpitude. Indeed, the Committee wrote "[w]e have found that *the facts underlying his conviction* involve moral turpitude" (Report at 86) (emphasis added), making clear that the Committee members regarded the facts and not Respondent's plea or the statutory language as most critical to their determination on moral turpitude.

Respondent also argues that Respondent's activities with respect to two additional transactions—the acquisition of control of County Federal Savings & Loan Association ("County Federal") and its parent holding company ("CFS") and Respondent's involvement with the acquisition of the ISI Corporation by Mr. Douglas Adams—did not involve moral turpitude. These arguments were considered fully by the Hearing Committee and the Board sees no basis to disrupt the Hearing Committee's findings with respect to these matters. Respondent's claims of innocence ring hollow in light of the substantial financial benefit that he and his patron, John Galanis, reaped from these and other transactions. His assertion that he was acting independently and that Mr. Galanis paid him $1.6 million in recognition of past due legal expenses and undefined "moral obligations" defies reason and is simply incredible, as well as inconsistent with the substantial evidence to the contrary introduced by Bar Counsel.

### Other Disciplinary Rule Violations

The Hearing Committee also found violations of the other disciplinary rules charged by Bar Counsel: DR 1–102(A)(3) ("illegal conduct involving moral turpitude that adversely reflects on [Respondent's] fitness to practice law"); DR 1–102(A)(4) (dishonesty, fraud, deceit, or misrepresentation); and DR 1–102(A) (5) (conduct prejudicial to the administration of justice).

The Hearing Committee found a violation of DR 1–102(A)(3) in connection with Respondent's conduct in a series of interrelated, fraudulent activities, including the acquisition of control of CFS through a group effort led by Mr. Galanis, in contravention of federal statutory requirements (Report at 74); misrepresentation of the circumstances of this acquisition to the FHLBB in interviews, documents and testimony (Report at 75–76); structured financing of the CFS stock in contravention of the FHLBB supervisory agreement (Report at 76–77); fraudulent representations in support of a $3 million loan from the American Security Bank with respect to Respondent's equity interest in his pledge of CFS stock and other funding sources (Report at 76–77); use of his position to induce CFS officials to extend millions of dollars in loans to insiders and specifically designated persons (Report at 77); CFS financing of NATCO development of commercial properties in Atlantic City, [New] Jersey (Report at 78); preparation of PPMs which did not disclose the involvement of John Galanis in the real estate partnerships (Report at 78); and Respondent's efforts on behalf of Mr. Douglas Adams in his efforts to secure financing from American Security Bank for his acquisition of ISI (Report at 79–81). The conduct underlying these violations is more fully described in the cited pages of the Report.

The Hearing Committee also found a violation of DR 1–102(A)(4) in Respondent's "filing of .the PPMs with the New York Real Estate Financing Bureau, his filings with the FHLBB which concealed his relationship with others associated with Mr. Galanis, and his applications for credit from American Security Bank in which he concealed information to inflate his net worth." (Report at 82–83). It also found a violation of DR 1–102(A)(5) when Respondent "lied to the FHLBB, under oath, during its investigation undertaken to determine whether the agency should approve the proposed change in control application and whether the Respondent and others previously had formed a control group without making the requisite disclosure." (Report at 83).

We have reviewed the factual background summarized in the Report, the Hearing Committee's findings, and the entire record before the Hearing Committee. We concur fully in the findings and conclusions of the Hearing Committee.

The Board rejects Respondent's claim of innocence with respect to the events and transactions described by the evidence. While there may be no single piece of paper which proves Respondent's knowledge of and involvement in the various fraudulent activities carried on by Galanis and other individuals acting on his behalf, the record as a whole is more than sufficient to demonstrate that Respondent was an integral part of the Galanis organization. Respondent may have been unaware of which specific individuals employed or otherwise controlled by Galanis would ultimately participate in any given transaction, but it is clear that he relied on Galanis and his organization to effect the complicated monetary transfers that underlie these transactions.

The Board believes that the documentary evidence provides a sufficient basis for proof of Respondent's direct participation in and knowledge of the fraudulent conduct of the Galanis-controlled organizations. The Report references the critical evidence in the record. The record is replete, however, with additional examples which exemplify the interrelated organizations and individuals involved in these schemes. While some references appear to be relatively insignificant, the cumulative effect is a compelling mosaic of facts that demonstrate that Respondent had sufficient information before him to appreciate fully the involvement of John Galanis in various activities. He either deliberately chose to close his eyes so that he could claim "ignorance" or deliberately mischaracterized information to suit his own ends. For example,

* The 1982 background investigation of John Galanis conducted by the DSM firm showed him to be employed by the Andover Finance Corporation (headed by his brother-in-law Thomas Williams) (BX 5).

The Andover Corporation was the source of funds used by Respondent for his initial purchase of CFS stocks, based on a nonrecourse promissory note for $336,300. (BX 7).

* The Federal Home Loan Bank Board (FHLBB) January 24, 1983 letter to Respondent inquiries whether John Paul Galanis is involved in any of a series of transactions specified in the letter concerning County Federal Savings and Loan Association (CFS)(BX 11). A February 16, 1983 FHLBB memorandum describes Respondent as participating in a discussion of various matters concerning the acquisition of control and operation of the CFS, including the involvement of Jay Botchman. (BX 13). Jay Botchman was involved in the Montana Trust Co., parent of NORSEC (BX 65 at 20); stock pledges for the Consolidated Mortgage Company (BX 88, 108); and was a partner of John Galanis (BX 206 at 18).

* Respondent's October 14, 1983 Pledge Agreement to the Virginia Corporation shows Respondent as the Debtor and Andover Corporation as the Borrower. It lists Chandra Galanis (John Galanis wife) and Thomas J. Williams (Galanis brother-in-law) as co-signers on a $200,000 note in favor of Respondent. (BX 18)

* Respondent's March 7, 1985 response to the Supervisory Agent of the FHLBB denies any "*direct or indirect* business relationship with Mr. Galanis or any of his business interests, *including loans or debts to or any shared interest with Mr. Galanis* or such interests." (emphasis added). Respondent describes Galanis as a "friend whom I see occasionally on a social basis" and further states that "my original investment in CFS to the present have been pursued entirely independently." (BX 58). This is completely contradicted by the information in BX 5, 7 & 18 (see above).

It is also contradicted by the involvement of the Leff & Mason firm in various business activities of Galanis, such as the Heartwell/NORSEC transactions de-

scribed in the August 2, 1984 letter from Helen Kanovsky to John Galanis (BX 36) and Respondent's own letter, dated December 3, 1984, to Arthur Anderson & Co. on these matters. (BX 48).

These contradictions are confirmed in the FHLBB Report of January 13, 1986, which states that in 1985, Respondent "received payments for legal fees of approximately $2.8 million from Nashua Trust Company ... [which] fees were paid to Mr. Mason personally and not to any law firm... Mr. Mason, who performed legal services of behalf of NATCO ... should have known about NATCO's affiliation with these individuals [Jay Botchman, John Galanis and Thomas Williams] and not have entered Columbia into any business transactions with them."(BX 116 at 2.2).

The exhibits and pleadings in this case consist of two cartons of paper. Bar Counsel and the Hearing Committee have done a remarkable job of making this voluminous record comprehensible. Although the financial dealings appear to be intentionally complicated, the common thread is the trail of Galanis-controlled organizations and individuals—Thomas Williams, Jay Botchman, John Landon, Ronald Williams, Abraham Feldman, and Respondent.

Respondent suggests that the fact that the Board recommended and the Court ordered that his law partner, Richard Perrin, receive a lesser sanction than disbarment is of significance. The Board notes that at the time it considered the Perrin matter, the record before it, as well as

before the hearing committee below, was not as complete as the present record. It is impossible to surmise what different conclusions the system might have reached if the complete array of facts now available had been presented in *Perrin*. It is also true that Perrin himself did not appear to have benefitted as substantially nor to have been as integrally involved as Respondent, outside the preparation of PPMs, in Galanis-controlled activities.

### Sanction

Respondent asserts that the appropriate sanction in these matters is a suspension for three years with a fitness requirement. The Hearing Committee recommends disbarment pursuant to D.C.Code § 11–2503(a) and the Board concurs. The record sufficiently establishes that Respondent's conduct in the preparation of the PPMs and beyond demonstrates conduct sufficient to constitute moral turpitude under the prevailing standard in *In re. Colson*, 412 A.2d 1160 (D.C.1979) (en banc).[5]

Disbarment would also be the appropriate sanction for the disciplinary rule violations, separate and apart from the criminal conviction. The magnitude and severity of the fraud and dishonesty of these activities far exceed those involved in *In re Casalino*, 697 A.2d 11 (D.C.1997) or *In re Goffe*, 641 A.2d 458 (D.C.1994), in which the Court ordered disbarment. Respondent also derived substantial personal gain from his involvement in this activities.[6]

In addition, the Hearing Committee recommends against the imposition of re-

---

5. In *Colson*, the Court of Appeals held that a crime involves moral turpitude (1) if "the act denounced by the statute offends the generally accepted moral code of mankind," (2) if it involves "baseness, vileness or depravity in the private and social duties which a man owes to his fellow men or to society in general, contrary to the accepted and customary rule of right and duty between man and man," or (3) if it includes "[c]onduct contrary to justice, honesty, modesty or good morals." *Id.* at 1168 (citations omitted).

6. Respondent's "Personal Financial Statement," dated September 10, 1985, showed marketable securities valued at $4.2 million, long-term obligations of $3.6 million, and a net worth of $2.3 million. (BX 93). His personal financial statement, dated July 17, 1986, claimed $15 million in assets and a new worth of $9.4 million. (BX 165). While these exhibits may also exemplify Respondent's misrepresentations to financial institutions, they also show significant personal gain during the period of time when Respondent's primary, if not sole, clients were Galanis-related entities.

ciprocal discipline based on the Massachusetts suspension of three years with a fitness requirement. It is apparent that the Massachusetts disciplinary system did not have as complete a record before it as was presented here. Based on precedents such as *Casalino* and *Goffe,* the appropriate sanction in this jurisdiction is disbarment, which is clearly "substantially different" than the suspension imposed by Massachusetts.