In the Matter of Joel I. KEILER, Respondent, a member of the Bar of the District of Columbia Court of Appeals, Bar No. 015909, Upon Consideration of the Report, Findings and Recommendations of the Disciplinary Board.

No. S–52–77.

District of Columbia Court of Appeals.

Argued Aug. 17, 1977.

Decided Oct. 17, 1977.

Fred Grabowsky, Washington, D. C., Bar Counsel, for the Disciplinary Board.

Alan D. Keiler, Washington, D. C., for respondent.

Before NEWMAN, Chief Judge, and KERN and YEAGLEY, Judges.

PER CURIAM:

A petition instituting disciplinary proceedings was filed against respondent on May 7, 1975, alleging that he had violated Disciplinary Rule 1–102(A)(5) of the Code of Professional Responsibility.[1]

That section provides that: "A lawyer shall not . . . (5) Engage in conduct that is prejudicial to the administration of justice." The matter was brought before an Inquiry Committee for an initial determination on April 9, 1975. The Committee's decision was to issue a reprimand to respondent and a co-respondent, Allen G. Siegel, who, having been involved in the same transaction, had been charged with the identical disciplinary violation. The latter accepted the judgment of the Inquiry Committee, but respondent chose otherwise and demanded a formal hearing before a Hearing Committee. See D.C.App. R. XI, § 8. Findings of fact and a recommendation as to disposition were filed by the Committee on April 8, 1976. The recommendation was that a private reprimand issue to respondent. After briefing and oral argument, the Disciplinary Board adopted the findings of the Hearing Committee, but in its report to the court recommended that respondent receive a one-month suspension from the practice of law. We adopt the Board's recommendation.[2]

The relevant facts and the issues raised were accurately detailed in the report of

---

1. The standard of professional conduct governing the practice of law in the District of Columbia is the American Bar Association Code of Professional Responsibility. D.C.App. R. X.

2. The court's order issued on October 17, 1977, the thirty-day suspension to be effective ten days thereafter.

the Disciplinary Board of January 31, 1977, and accordingly are set forth hereinafter in pertinent part:

"Respondent, an associate in a Washington law firm, worked exclusively on labor-management matters. Among the firm's clients was a Florida company whose employees were represented by a union. The terms of the company-union collective bargaining agreement provided for arbitration of disputes. The union business agent challenged the company on payments made for work performed on a Saturday. The parties agreed to submit the issue to arbitration. Respondent testified that the union business agent 'didn't care whether he won or not, it [the arbitration hearing] was something he had to do and we had to go along with it.' (Hearing Committee No. 2, Transcript, p. 20). As for the selection of an arbitrator, respondent testified that he was told by the union representative: 'You can pick anybody you want. We don't care.' (Hearing Committee No. 2, Transcript, p. 21).

"On his return to Washington from Florida, respondent advised the labor law partner of his firm of the events that transpired in Florida and of the conversation he had with the union representative. Respondent invited the labor law partner to act as arbitrator in this proceeding. After a discussion of the merits of the case, the labor law partner accepted the invitation. The union representative was not advised of the fact that a member of the firm representing the employer was acting as the arbitrator. At the brief arbitration proceedings in Florida the labor law partner, (hereinafter 'arbitrator') acted as if he were a disinterested arbitrator in a typical arbitration, while respondent served as the employer's counsel in presenting its case. Respondent neither said nor did anything to reveal the 'arbitrator's' true identity and relationship to the case, nor did he, at any time, seek to dissuade the 'arbitrator' from a continuation of the charade. Following the proceedings, the 'arbitrator' issued a ruling accepting the contentions of respondent on behalf of his client, the employer. In issuing the opinion and award, certain steps were taken to mask the relationship between the 'arbitrator' and his law firm. The 'arbitrator' did not sign the award in his customary form but in a form never utilized by him, as if John F. Kennedy were to have signed J. Fitzgerald Kennedy.

"By prearrangement the 'arbitrator' forwarded the award to a relative in Florida in an outer envelope, which was then removed and the award mailed once again so that it arrived at the union's office with a Florida postmark. The opinion contained no return address and the plain paper of the opinion contained only the 'arbitrator's' signature. Respondent states that he did not participate in the decision to use this procedure and form of signature.[3]

## "*Action of the Hearing Committee*

"After setting forth these facts, the Hearing Committee concluded that respondent did not conduct himself properly in the case, concurred in the action of the Inquiry Committee, and recommended 'that a private reprimand be forwarded to [Respondent] by the Disciplinary Board.' (Report of Hearing Committee No. 2 to the Disciplinary Board, p. 2).

## "*Jurisdiction of this Disciplinary Board to Decide this Case*

"Respondent suggests that as the Disciplinary Board did not exist in June 1971 when his questioned conduct occurred, this Board, which was established in 1972, does not have jurisdiction to decide this case. Before 1972 all attorneys who engaged in the practice of law in the District of Columbia were required to be members of the Bar

---

**3.** In addition to concealing the identity of the "arbitrator", this effort to have a "Florida" arbitrator may have been connected with the Union Business Agent's offer, in his original discussion with Respondent, to pay half of the arbitration costs if the arbitrator were from Dade County, Florida, but not to pay any costs if the arbitrator were from elsewhere. It is unclear as to what costs, if any, were finally allocated to the Union. (Hearing Committee No. 2, Transcript p. 21).

of the United States District Court for the District of Columbia. (United States District Court for the District of Columbia, Local Civil Rule 96, adopted by Order dated June 27, 1961). In 1972, a major transfer of jurisdiction from the federal courts in the District of Columbia to the local courts occurred. The Superior Court and the District of Columbia Court of Appeals were affected and all members of the Bar of the District Court for the District of Columbia were also 'automatically enrolled as members of the Bar of the District of Columbia Court of Appeals, and shall be subject to its disciplinary jurisdiction.' (D.C.Code § 11–2501(c) (1973)). To effectuate the automatic enrollment, each attorney was required only to file a registration statement containing a minimum of descriptive information (Bar Counsel Exhibit 7). No tests as to legal proficiency or character were imposed. Disciplinary responsibility was now fixed within the District of Columbia Court of Appeals and its creation, the disciplinary system.

"The organizing principle of the new court system was to give jurisdiction over categories of cases based upon the date of the filing of the case, not the date of the occurrence upon which the court action was predicated. Cf. D.C.Code § 11–921 (1973). So here, the date of the filing of the disciplinary case, not the date of the acts under review, is the determinative factor as to whether jurisdiction exists in this disciplinary system. As this case was filed after the establishment of this disciplinary system, the Board has jurisdiction. Merit and demerit are carried forward through the automatic enrollment process. Nothing in the legislation suggests an amnesty regarding a lawyer's unethical conduct committed prior to the creation of this system.

"Also a further reason compels the conclusion that the Board does have jurisdiction over the attorney, for otherwise his conduct would go unjudged. The pre-1972 jurisdiction (Local Civil Rule 96, *supra*) over attorneys who practice in the District of Columbia no longer exists, and the District Court's jurisdiction is limited to members of the court's bar, which only affects an attorney's practice before that court, but not elsewhere in the District of Columbia. That conduct of a lawyer occurring before the transfer of jurisdiction should go unjudged was not a purpose of the court reorganization.

·    ·    ·    ·    ·

"*The Harm to the Administration of Justice*

"The Hearing Committee concluded that respondent engaged in conduct prejudicial to the administration of justice. Respondent disagrees and argues that the 'arbitrator's' decision was the only possible determination of the case for the union business agent conceded that his position had no merit and that the request for arbitration was politically motivated. Further, no employee had actually filed a grievance to institute the arbitration proceeding. Though the business agent's request for arbitration was eventually filed, no person or individual was injured or harmed. Finally, the issue submitted to arbitration was treated definitively and contrary to the union's contention in a new collective bargaining agreement between the parties.

"*This Board's View*

██ "A decision in this case does not rest on whether the 'arbitrator's' award was precisely the same as would be rendered by a disinterested arbitrator. Not only is this an erroneous concept of the measure of the harm to the administration of justice from a sham proceeding, but, in fact, the harm is greater than the decision of an arbitrator in a single case. The union sought to arbitrate a claim, and the employer agreed to do so, waiving the defense that the claim was not timely filed or procedurably unsuitable for an arbitration decision. Perhaps the business agent sought an arbitration as a political maneuver, and the employer acquiesced to avoid a strike. The simple fact is that an arbitration was to take place. Whatever the business agent meant when he told respondent to choose his own arbitrator, he did not mean to choose a lawyer in the same firm representing the employer. If that were so, then respondent and his

colleague would certainly have told the union business agent the identity of the 'arbitrator', which they most emphatically did not do then or later.[4]

"The business agent was also acting on behalf of the union membership. They certainly had reason to believe that an arbitration meant a determination by a disinterested party, not by the adversary's counsel dressed in arbitrator's robes. Nor is this a case where both parties agree during the course of an arbitration as to the terms of an acceptable settlement or resolution and submit their resolution to the arbitrator. A disinterested arbitrator can accept the resolution as being fair or refuse to do so on the grounds that the jointly proposed settlement does violence to the language of the applicable collective bargaining agreement.

"A sham arbitration misleads one party totally, and the damage to the administration of justice is far-reaching. Here, the union membership and all other persons who look at the 'arbitrator's' opinion, even if only to determine guiding principles in some other case, will consider it the product of a disinterested arbitrator based upon consideration of the facts and applicable contract, which, by definition, did not occur. Even at this date the union still does not know how the 'arbitrator' was selected. It must be made aware of this decision, to determine what, if any, remedy should be sought. Thus, harm results to the administration of justice when the conduct of a judicial or quasi-judicial proceeding is such as to render that proceeding a bogus one. Acts in violation of the integrity of such a proceeding constitute harm to the administration of justice.

"*The Violation of the Disciplinary Rule Charged*

"On April 1, 1972, the District of Columbia Court of Appeals adopted the Code of Professional Responsibility, as amended, as the standard governing the practice of law in the District of Columbia. (D.C.App. Rule X). The acts which are the subject of this proceeding occurred on June 24, 1971. The petition instituting the formal disciplinary proceedings was filed May 7, 1975 and charged that 'the respondent arranged for a member of his own law firm . . . to act as the arbitrator while respondent represented the employer' (Petition Instituting Formal Disciplinary Proceedings, Para. 7) and that respondent 'did not divulge his relationship with [the member of his law firm] to the representative of the union *before, during or after* the arbitration.' (Emphasis added). (Petition Instituting Formal Disciplinary Proceedings, Para. 8).

"Various issues which must be resolved are raised by this chronology. A brief historical resume is useful to illustrate the point. First is the question of the Standard by which he should be judged. Respondent was a member of the Bar of the United States District Court for the District of Columbia, admitted to practice on December 20, 1961. By the terms of that admission, he was subject to discipline before the United States District Court 'for any cause or offense which may justify disbarment, suspension, censure or other disciplinary action.' (U.S. Dist. Ct. for the District of Columbia, Local Civil Rule 94(a)). Rule 94 does not contain any specific standard for conduct and apparently none was intended. A judge could file a complaint against any member who has 'conducted himself in an unprofessional, unethical or improper manner in a proceeding had in that court . . .'. (U.S. Dist. Ct. for the District of Columbia, Local Civil Rule 94(b)). Even today the United States District Court does not limit actions against attorneys to any particularized standard. The committee on grievances, which examines misconduct charges against attorneys who are members of the Bar of the United States District Court, is 'guided by, but not limited to, the American Bar Association Code of Professional Responsibility and Canons of Professional

---

4. Collaterally, the selection of an arbitrator does not mean that one party will also have an ex parte discussion of the merits of the case with the arbitrator and his advance concurrence as to how he will rule, as happened here between respondent and the "arbitrator". (Hearing Committee No. 2, Transcript pp. 7, 8).

Ethics.' (U.S. District Court D.C. Rule 4–3(c)).

█ "The broad power of the court to discipline errant members of the Bar which existed under the United States District Court rules was carried forward at the time of the creation of this disciplinary system for conduct that occurred prior to the creation of the system. The present rule provides as follows:

'Acts or omissions by an attorney, individually or in concert with any other person or persons, which violate the rules of professional conduct that *have been*, and any that may be from time to time hereafter, adopted by this court, shall constitute misconduct and shall be grounds for discipline.' (Emphasis added). (D.C. App. Rule XI, Section 2).

"As respondent's action occurred prior to the adoption of the Code, he is subject to the broad standard which existed at the time under the court's 'inherent disciplinary powers' (U.S. Dist. Ct. for the District of Columbia, Local Civil Rule 94(j)).

"Bar Counsel, in filing the instant petition, proceeded in a measured manner and charged respondent on a specific disciplinary provision, DR 1–102(A)(5). This Disciplinary Rule does not create a new standard of conduct but rather codifies existing standards. The inclusion of a specific disciplinary rule gives respondent a better opportunity to defend than the generalized statement of wrongdoing permissible under the rules of the United States District Court in effect prior to the adoption of the Code of Professional Responsibility. [Footnote omitted.]

█ "Further, respondent is charged not only for the failure to make known his relationship with the 'arbitrator' to the representative of the union before or during the arbitration but also after the arbitration. That failure continues to this day.

5. An identical provision also appeared in a similar predecessor statute. *Curtis v. Whiteford*, 59 App.D.C. 330, 41 F.2d 302 (1930); *Costigan v. Adkins*, 57 App.D.C. 153, 154, 18 F.2d 803, 804, *cert. denied*, 274 U.S. 760, 47 S.Ct. 769, 71 L.Ed. 1338 (1927).

On the theory of a continuing offense, respondent's disciplinary violation occurred after the adoption of the Code. In either event, the charge under the Disciplinary Rule cited is valid."

We concur in the foregoing excerpts from the Board's report. We shall, however, elaborate somewhat regarding the jurisdiction of this court to consider and punish a member of the bar for an act occurring prior to April 1, 1972.

Up until that time the disciplining of members of the bar, as noted by the Board, was the responsibility of the United States District Court. D.C.Code 1967, § 11–2102. The statute, effective January 1, 1964, authorized that court to "censure, suspend from practice, or expel, a member of its bar for . . . conduct prejudicial to the administration of justice."[5] The Court Reform and Criminal Procedure Act of 1970 provided that effective April 1, 1972, "[t]he District of Columbia Court of Appeals shall make such rules as it deems proper respecting the examination, qualification, and admission of persons to membership in its bar, and their censure, suspension, and expulsion." D.C.Code 1973, § 11–2501(a).

█ The Congress at that time also conferred on this court the same authority over attorneys as had been accorded the United States District Court in D.C.Code 1967, § 11–2102, *supra*, regarding conduct prejudicial to the administration of justice by reenacting that provision, substituting the name of this court for that of the District Court.[6] D.C.Code 1973, § 11–2502.

█ Inasmuch as the law as far back as 1964, at least, has proscribed the same conduct as Disciplinary Rule 1–102(A)(5), *supra*, it cannot be argued that the conduct here was innocent when done. We hold that its punishment by us under the authority transferred to this court by the Con-

6. This essentially is a codification of an inherent power of this court acquired upon its designation by Congress as the "highest court of the District of Columbia." D.C.Code 1973, § 11–102.

gress does not offend the constitutional prohibition against ex post facto laws. *State v. Martindale*, 215 Kan. 667, 527 P.2d 703 (1974). *See also Dobbert v. Florida*, 432 U.S. 282, 97 S.Ct. 2290, 53 L.Ed.2d 344 (1977).

Throughout this proceeding, respondent has maintained that the undisclosed use as arbitrator of a partner in the firm which employed him did not prejudice the administration of justice. He claims that his conduct was justified by the realities of labor-management arbitration.

Respondent notes that the process of selecting an arbitrator usually begins with the submission of a list of available arbitrators by the Federal Mediation Service. The union and employer then strike names from the list until the desired number of arbitrators remain. Respondent contends that this procedure forces the arbitrators who desire appointments to follow the practice of compromising claims since those who compromise are less risky to the parties, and therefore less likely to be stricken by either labor or management. Hence, if respondent had chosen a neutral arbitrator he would have run the risk of compromise, even though the union's claim was thought to be without merit. Respondent therefore felt that the only way to avoid the possibility of an unfavorable ruling was to select an arbitrator he could trust. He maintains that justice "would not have been administered had there been any finding other than that the union's claim had no merit." In short, he argues that the undisclosed use of an associate as arbitrator produced a correct decision, and therefore, the administration of justice was not prejudiced.

■ We cannot agree with respondent's position. He fails to realize that the prohibition against "conduct prejudicial to the administration of justice" bars not only those activities which may cause a tribunal to reach an incorrect decision, but also conduct which taints the decision making process. Improper conduct may prejudice the administration of justice even though it fosters a correct decision.

As the Disciplinary Board stated in its report:

A sham arbitration misleads one party totally, and the damage to the administration of justice is far-reaching. Here, the union membership and all other persons who look at the "arbitrator's" opinion, even if only to determine guiding principles in some other case, will consider it the product of a disinterested arbitrator based upon consideration of the facts and applicable contract, which, by definition, did not occur.

■ Thus, by utilizing an associate as an arbitrator without disclosing this fact to the union representative, respondent compromised the administration of justice. We view such conduct, *i. e.*, denying a party the services of an impartial judicial officer, as the perpetrating of a fraud on the judicial system. The utter futility respondent has demonstrated in justifying his conduct is understandable. The argument he has advanced leaves us to wonder if he has any appreciation that such conduct is highly improper. To argue that the conduct here was permissible because the issue before the hearing officer was of little importance and that only one result would have been proper is to display an amazing lack of understanding of our judicial system and the essential elements of justice. It is no defense to say that no harm was done since a member of the bar, in his professional capacity, should never attempt to deceive another person. *Sodikoff v. State Bar of California*, 14 Cal.3d 422, 121 Cal.Rptr. 467, 535 P.2d 331 (1975) (en banc); *McKinney v. State Bar*, 62 Cal.2d 194, 41 Cal.Rptr. 665, 397 P.2d 425 (1964) (en banc) and cases cited.

The crux of the American system of justice is basic fairness. If this is to be fully realized the parties must be assured that the officer hearing their case has no inherent or preconceived bias or other interest in the outcome.

The standard we impose is not too exacting. As Mr. Justice Frankfurter said in *Schware v. Board of Bar Examiners*, 353 U.S. 232, 247, 77 S.Ct. 752, 761, 1 L.Ed.2d 796 (1957):

**126**

It is a fair characterization of the lawyer's responsibility in our society that he stands "as a shield," to quote Devlin, J., in defense of right and to ward off wrong. From a profession charged with such responsibilities there must be exacted those qualities of truth-speaking, of a high sense of honor, of granite discretion, of the strictest observance of fiduciary responsibility, that have, throughout the centuries, been compendiously described as "moral character."

■ Respondent also claims that Disciplinary Rule 1–102(A)(5) is unconstitutionally vague. We find this contention to be wholly without merit. The language of the rule is clear. It is not a new standard but a restatement of a previously existing one. *See, e. g.*, American Bar Association Special Committee on Evaluation of Ethical Standards, Code of Professional Responsibility (Preliminary Draft 1969).

■ The test as to vagueness of a criminal statute is does it give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the rule. *United States v. Harriss*, 347 U.S. 612, 617, 74 S.Ct. 808, 98 L.Ed. 989 (1954). It has been specifically held that the word "prejudicial" in Rule 1–102(A)(5) is not constitutionally vague. *State v. Nelson*, 210 Kan. 637, 640, 504 P.2d 211, 214 (1972). In a subsequent case, the Kansas court again said it found no merit in such a contention. *State v. Martindale, supra* at 670, 527 P.2d at 706. The rule was written by and for lawyers. The language of a rule setting guidelines for members of the bar need not meet the precise standards of clarity that might be required of rules of conduct for laymen. *See Parker v. Levy*, 417 U.S. 733, 756, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974).[7]

■ Further, although Disciplinary Rule 9–101(C) is not in issue here, a practicing attorney is chargeable with knowledge that it provides: "A lawyer shall not state or imply that he is able to influence improperly or upon irrelevant grounds any tribunal, legislative body, or public official." If he is prohibited from claiming he can exercise such influence he should know that the purport of the rules also is to proscribe his actually doing it.

■ We adopt the recommendation of the Board and respondent is ordered suspended from the practice of law for one month (30 days).[8]

---

7. A number of other jurisdictions have similarly rejected claims that rules like Disciplinary Rule 1–102(A)(5) are unconstitutionally vague. *Matter of Smith*, 233 S.E.2d 301, 304 (S.C. 1977); *Office of Disciplinary Counsel v. Campbell*, 463 Pa. 472, 482–484, 345 A.2d 616, 621–22 (1975), *cert. denied*, 424 U.S. 926, 96 S.Ct. 1139, 47 L.Ed.2d 336 (1976).

8. We appreciate that this leaves the two participants with substantially different punishment, however, since respondent's confederate decided to accept the decision of the Inquiry Committee imposing a reprimand his case is not before us.