## In the Matter of the Discipline of an Attorney.

Suffolk. September 7, 2004. - October 13, 2004.

Present: Marshall, C.J., Greaney, Ireland, Spina, Cowin, Sosman, & Cordy, JJ.

*Attorney at Law,* Disciplinary proceeding, Conduct prejudicial to administration of justice. *"Anti-SLAPP" Statute.*

The Board of Bar Overseers correctly concluded that the conduct of an attorney that neither flagrantly violated accepted professional norms nor undermined the legitimacy of the judicial process could not constitute sanctionable conduct prejudicial to the administration of justice under S.J.C. Rule 3:07, Canon 1, DR 1-102 (A) (5), as appearing in 382 Mass. 769 (1981), where that conduct violated no other disciplinary rule. [667-673]

This court concluded that the provisions of G. L. c. 231, § 59H (the "anti-SLAPP statute"), did not apply to the circumstances of a bar discipline case. [673-674]

Information filed in the Supreme Judicial Court for the county of Suffolk on August 8, 2002.

The case was reported by *Greaney,* J.

*John W. Marshall,* Assistant Bar Counsel.

*Martin R. Rosenthal* for the respondent.

*Sarah R. Wunsch, Andrew H. Good, Patricia A. DeJuneas & David Duncan,* for American Civil Liberties Union of Massachusetts & another, amici curiae, submitted a brief.

Marshall, C.J. The principal issue in this case is whether an attorney's conduct that the Board of Bar Overseers (board) concluded neither "flagrantly violat[ed] . . . accepted professional norms" nor "undermine[d] the legitimacy of the judicial process," *Matter of the Discipline of Two Attorneys,* 421 Mass. 619, 628, 629 (1996), may be sanctionable conduct "prejudicial to the administration of justice" under S.J.C. Rule 3:07, Canon

1, DR 1-102 (A) (5), as appearing in 382 Mass. 769 (1981),[1] even though the conduct violated no other disciplinary rule. Eleven members of the board voted unanimously that it may not. For the reasons discussed below, we affirm the board's decision. We also consider whether an attorney may invoke G. L. c. 231, § 59H (commonly referred to as the "anti-SLAPP" statute[2]), to recover attorney's fees and costs in disciplinary proceedings. We conclude that, in the circumstances of this case, the attorney may not.[3]

1. *Background.* The resolution of this case turns on specific facts, which we review in some detail.[4] We begin by describing the respondent's practice and experience.

The respondent has been a member of the Massachusetts bar for over thirty years. He maintains a national practice defending gas and electric utility companies in tort litigation. The respondent has never been disciplined, either in Massachusetts or in any other jurisdiction.

In the early 1980's, the respondent began representing a gas utility company doing business in Massachusetts (client). He has been the client's primary outside litigation counsel ever since, handling over one hundred of its cases. In addition to litigating on the client's behalf, the respondent has advised both the client and its investigators how to respond to claims and

---

[1]Supreme Judicial Court Rule 3:07, Canon 1, DR 1-102 (A) (5), as appearing in 382 Mass. 769 (1981), provides: "A lawyer shall not . . . [e]ngage in conduct that is prejudicial to the administration of justice." The Massachusetts Rules of Professional Conduct became effective on January 1, 1998, replacing the former Canons of Ethics and Disciplinary Rules. S.J.C. Rule 3:07, as appearing in 426 Mass. 1303 (1998). Disciplinary Rule 1-102 (A) (5) was superseded by the identically worded Mass. R. Prof. C. 8.4 (d), 426 Mass. 1429 (1998).

[2]"SLAPP" is an acronym for "Strategic Lawsuit Against Public Participation," a term coined by George W. Pring and Penelope Canan. See Pring, SLAPPs: Strategic Lawsuits Against Public Participation, 7 Pace Envtl. L. Rev. 3, 4 (1989). "The objective of SLAPP suits is not to win them, but to use litigation to intimidate opponents' exercise of rights of petitioning and speech." *Duracraft Corp.* v. *Holmes Prods. Corp.*, 427 Mass. 156, 161 (1998).

[3]We acknowledge the amicus brief filed jointly by the American Civil Liberties Union of Massachusetts and the Massachusetts Association of Criminal Defense Lawyers.

[4]We summarize the facts found by the board's three-member hearing committee (hearing committee), and subsequently adopted by the board in full. We supplement as needed from other uncontested facts of record.

potential claims resulting from fires or explosions. Among other things, he has helped the client develop and implement protocols for gathering and preserving evidence. The respondent has had and continues to have an interest in protecting the long-term interests of the client.

The respondent's actions at issue here began in 1995. At that time, the respondent represented the client in litigation as a result of a fire in the basement garage of a home.[5] A State trooper assigned by the Commonwealth's fire marshal's office to investigate the fire had written a report concerning the source of ignition that was potentially harmful to the client.[6] In connection with the litigation, the respondent took part in the trooper's deposition, the relevant portions of which occurred on two days, three months apart, when the trooper was unrepresented by counsel. During the course of the deposition, the respondent elicited evidence tending to show that the trooper had little specialized training and little understanding of subjects integral to investigating causes of fires or gas explosions, such as the identities of varying chemical compositions, properties, and explosive limits of gasoline, propane, and natural gas, and the items capable of creating sparks sufficient to ignite gasoline. The respondent also elicited testimony that the trooper did not know how to operate scientific instruments used in fire investigations, such as a gas chromatograph, mass spectrometer, split wire anemometer, and piezometer.

During the second day of testimony, the trooper stated to the respondent, "I request that this hearing be postponed. . . . I

[5]The fire occurred in September, 1991, seriously burning three children between the ages of two and four years and injuring two adults. The client supplied the home with liquified propane, which, among other things, fueled the basement water heater. The plaintiffs brought suit against the client, the manufacturer of the water heater, the manufacturer of the furnace, and a company whose name appeared on a label on the water heater. The cause of the fire was a major issue in the litigation and the stakes were high: the initial settlement demand was for $50 million. The case eventually settled in mediation.

[6]After examining the site and conducting interviews, the trooper concluded that the water heater ignited a cloud of propane emanating from a leak in the furnace. The trooper's written report concluded that the propane, in turn, ignited gasoline vapors, causing the fire. During his deposition and under cross-examination by the respondent, the trooper admitted that he later abandoned that and other theories and adopted a different causation theory.

object to the form of questioning, I object to the argumentative nature of the questions, and I wish advice of counsel. So I request a postponement."[7] The deposition then adjourned over the respondent's objection. The respondent testified to the hearing committee that, when he tried to talk to the trooper, the trooper called him a "jerk," walked out of the room, and called the respondent a highly insulting expletive.

The hearing committee found that, based on the testimony elicited at the trooper's deposition, the respondent believed that the trooper was "incompetent"[8] and "hostile"; he felt the trooper's incompetence and hostility "might adversely impact" his client's "long-standing working relationship with the [f]ire [m]arshal's [o]ffice," "as well as [the client's] legitimate concerns in other fire and explosion investigations." The respondent also, in the hearing committee's words, "thought it would be in [the client's] best interest to have [the trooper] removed from such investigations." Additionally, the hearing committee found that the respondent was *not* concerned about the effect of the trooper's testimony in the case at hand because he "believed [the trooper's] credibility at trial would be undercut by effective cross-examination."

Two days after the trooper suspended his deposition, the respondent contacted the private fire investigator with whom he was working on the case and asked the investigator to forward a complete copy of the trooper's deposition transcript to the trooper's supervisor in the fire marshal's office, with whom the investigator had a long-standing working relationship. On July

---

[7]The respondent had repeatedly questioned the trooper concerning details of the fire scene that the trooper averred he did not recall.

[8]Specifically, the hearing committee found that the respondent "has consistently asserted that in the course of [the trooper's] investigation of the fire, [the trooper] did not do any of the following: take any photographs; bring or use a camera, testing equipment, measuring equipment or anything to collect or preserve evidence; operate or test the liquid propane fueled appliances or observe their operation; perform or observe any tests which might be useful in determining the origin or cause of the fire; document the fire scene; tape record any interviews with witnesses; take any samples of incident debris; map the location of the fire debris; or preserve any evidence or take any steps to cause it to be preserved. The respondent believed that [the trooper] had not acted in a competent fashion in his work at the fire scene, and that accordingly [the trooper's] views of the fire were flawed."

24, 1995, the investigator arranged to meet with the supervisor so he could personally deliver the transcripts. During the meeting, the investigator told the supervisor that the respondent thought the trooper incompetent to investigate fires. The trooper then joined the meeting at his supervisor's suggestion, whereupon the investigator repeated the respondent's charge of incompetence.[9]

We now summarize the history of the disciplinary proceedings resulting from the challenged conduct.

2. *Disciplinary proceedings.* The only conduct ever challenged by bar counsel is the respondent's sending of the deposition transcript to the fire marshal's office. On December 2, 1996, an attorney from the office of bar counsel wrote to the respondent notifying him that he had initiated an investigation into that conduct. The respondent, through counsel, vigorously denied any wrongdoing and requested that the inquiry summarily be closed. Almost three years later, on November 15, 1999, bar counsel filed a petition for discipline against the respondent.[10]

Bar counsel charged that by forwarding the deposition transcript to the supervisor, the respondent had attempted to "harass or maliciously injure" the trooper and to "intimidate [the trooper] and/or to influence his testimony." Such conduct, bar counsel charged, violated S.J.C. Rule 3:07, Canon 1, DR 1-102 (A) (5) and DR 1-102 (A) (6), as appearing in 382 Mass. 769 (1981)[11]; S.J.C Rule 3:07, Canon 7, DR 7-102 (A) (1),[12] as

---

[9]Although the respondent contends he had sent the transcripts to the fire marshal's office so the supervisor could draw his own conclusions about the trooper's competence, the hearing committee found that the respondent knew or should have known that the investigator would share the respondent's opinions with the supervisor, and that the supervisor would share the opinions with the trooper.

[10]The petition was brought pursuant to S.J.C. Rule 4:01, § 8 (3), as appearing in 425 Mass. 1309 (1997), and §§ 3.13 (2) and 3.14 of the Rules of the Board of Bar Overseers.

[11]Supreme Judicial Court Rule 3:07, Canon 1, DR 1-102 (A) (6), as appearing in 382 Mass. 769 (1981), provides: "A lawyer shall not . . . [e]ngage in any other conduct that adversely reflects on his fitness to practice law." See note 1, *supra.*

[12]Supreme Judicial Court Rule 3:07, Canon 7, DR 7-102 (A) (1), as appear-

appearing in 382 Mass. 785 (1981); and S.J.C. Rule 3:07, Canon 7, DR 7-106 (C) (7), as appearing in 382 Mass. 787 (1981).[13] On March 20, 2000, the respondent filed an answer denying any misconduct. He claimed that he contacted the fire marshal's office, not to influence the trooper's testimony, but to protect his client's legitimate interests and to protect the general public. The respondent simultaneously moved for an expedited dismissal, which bar counsel opposed. On May 8, 2000, the motion was denied. The respondent's subsequent motions to dismiss the matter at the initial stages also failed. On June 16, 2000, the investigation was referred to a three-member hearing committee for further consideration. The hearing committee held a prehearing conference on June 28, 2000, and hearings on July 31, September 6, and October 31, 2000.[14]

On July 24, 2001, the hearing committee issued its report. The committee members agreed with the respondent that his conduct in forwarding the trooper's deposition transcript was driven, at least in part, by his desire to protect his client's "legitimate concerns in other fire and explosion matters." It also found that the respondent expected that the supervisor, after reading the transcript, would remove the trooper from further fire investigation work and require him to obtain special training, a development the respondent freely acknowledged that he knew "would not help the credibility" of the trooper in the underlying litigation. The hearing committee found no basis for concluding that the respondent's conduct violated

ing in 382 Mass. 785 (1981), provides that, "[i]n his representation of a client, a lawyer shall not . . . [f]ile suit, assert a position, delay a trial, conduct a defense, or take other action on behalf of his client when he knows or when it is obvious that such action would serve merely to harass or maliciously injure another."

[13]Supreme Judicial Court Rule 3:07, Canon 7, DR 7-106 (C) (7), as appearing in 382 Mass. 787 (1981), provides: "In appearing in his professional capacity before a tribunal, a lawyer shall not . . . [i]ntentionally or habitually violate any established rule of procedure or evidence."

[14]Bar counsel called no witnesses and relied only on the stipulation to the exhibits in his case-in-chief. The respondent testified and called two witnesses, a vice-president of his gas utility client and a certified fire investigator. Both parties then submitted proposed findings of fact and rulings of law. Bar counsel sought a public reprimand, and the respondent sought a public apology and an order for bar counsel to pay all the respondent's costs and legal fees.

DR 1-102 (A) (6), DR 7-102 (A) (1), or DR 7-106 (C) (7). However, it concluded that the respondent did violate DR 1-102 (A) (5), because he "attempt[ed] and intend[ed] thereby to improperly influence [the trooper's] testimony." Concluding that the respondent "is an able and experienced advocate, who demonstrated concern for the case-specific as well as the more global interests of his client" and that his "actions were the result of a failure to reflect adequately on the ethical and procedural issues involved rather than an indication of a deliberate intention to violate a rule of ethical practice," the hearing committee recommended that the respondent receive an admonition.

Both parties appealed to the full board. See S.J.C. Rule 4:01, § 8 (4), as appearing in 425 Mass. 1309 (1997). On appeal, bar counsel sought only to increase the sanction for the violation of DR 1-102 (A) (5) to a public reprimand. He did not challenge the hearing committee's factual findings or conclusions of law.[15] In contrast, the respondent challenged many of the hearing committee's findings of fact as unfounded, inconsistent, incomplete, or based on inadmissible evidence. He also argued that the conclusions of law did not reflect "a true and complete reading of the entire facts and record." The respondent sought dismissal of the petition.

On February 11, 2002, eleven members of the board present unanimously voted to do just that. The board adopted the hearing committee's findings of fact. However, they concluded that where, as here, DR 1-102 (A) (5) is the sole basis for imposing discipline, the conduct at issue must be "conduct whose seriousness is beyond question" and that is "flagrantly violative of accepted professional norms." *Matter of the Discipline of Two Attorneys*, 421 Mass. 619, 628 (1996). The board concluded that, although the respondent's conduct was in some respects "troubling" and not "in the finest tradition of the bar," it was not sufficiently acute to merit sanction under DR 1-102 (A) (5).

At bar counsel's request, the board filed an information in the county court for review of the board's decision. See S.J.C.

---

[15]Bar counsel has waived any challenge to the hearing committee's conclusions that the respondent did not violate DR 1-102 (A) (6), DR 7-102 (A) (1), or DR 7-106 (C) (7).

Rule 4:01, § 8 (4).[16] On October 7, 2002, the respondent filed a special motion to dismiss pursuant to G. L. c. 231, § 59H, seeking a stay of the proceedings, expeditious dismissal, and costs and attorney's fees. A single justice reserved and reported the matter to the full court without decision.

3. *Discussion.* The standard of review for appeals of bar discipline cases is well established. "[A]lthough not binding on this court, the findings and recommendations of the board are entitled to great weight." *Matter of Fordham*, 423 Mass. 481, 487 (1996), citing *Matter of Hiss*, 368 Mass. 447, 461 (1975). "[S]ubsidiary facts found by the Board and contained in its report filed with the information shall be upheld if supported by substantial evidence, upon consideration of the record." S.J.C. Rule 4:01, § 8 (4). We, however, "review the board's findings and reach our own conclusion." *Matter of Fordham, supra,* citing *Matter of Anderson*, 416 Mass. 521, 525 (1993).

The board correctly identified *Matter of the Discipline of Two Attorneys, supra* at 628, as our leading case on the reach of DR 1-102 (A) (5), where the rule forms the sole basis for attorney discipline.[17] There we noted that the broad language of the rule "presents the risk of vagueness and arbitrary application," *id.* at 628-629, and we acknowledged the need to curtail that risk by adopting a narrowing construction. See *id.* at 629. Finding no controlling precedent, we sought guidance from analogous deci-

---

[16]Bar counsel simultaneously moved to impound the record of these proceedings to assure confidentiality. See S.J.C. Rule 4:01, § 20 (3) (d), as appearing in 425 Mass. 1327 (1997) (providing that bar discipline proceedings are open to public except for "further proceedings following . . . an order of the Board [of Bar Overseers] . . . that a petition for discipline be dismissed. In such event, the record shall be sealed and the proceedings shall be closed until and unless the Board or this court orders otherwise").

[17]In that case, two attorneys in the same firm simultaneously represented buyers of real estate and a judgment creditor of the seller. Using information about the seller that they obtained in the course of representing the buyers, and acting as escrow agents for the sale of the real estate, the attorneys obtained a trustee process attachment against their own firm in favor of the judgment creditor and satisfied the judgment from the amount in escrow. The buyers were unaware of their attorneys' actions. *Matter of the Discipline of Two Attorneys*, 421 Mass. 619, 620-621 (1996). Concluding that the attorneys' actions breached their fiduciary duties as escrow holders, *id.* at 627, we nevertheless held, among other things, that those actions were not "prejudicial to the administration of justice" in violation of DR 1-102 (A) (5). *Id.* at 629.

sions of other State courts. We noted with approval the Florida Supreme Court's conclusion that vagueness and arbitrariness concerns were best answered by construing DR 1-102 (A) (5) to be "not so broad as to include all conduct which is illegal but rather those activities [such as bribery, perjury, misrepresentations to a court] 'which undermine[] the legitimacy of the judicial processes.' " *Florida Bar* v. *Pettie*, 424 So. 2d 734, 737-738 (Fla. 1983), quoting *Polk* v. *State Bar of Tex.*, 374 F. Supp. 784, 788 (N.D. Tex. 1974). We also quoted the New Jersey Supreme Court's statement that "on those few occasions when the rule has served as the sole basis for discipline, it has been applied only in situations involving conduct flagrantly violative of accepted professional norms." *Matter of Hinds*, 90 N.J. 604, 632 (1982). We concluded that conduct that does not violate any other disciplinary rule cannot violate DR 1-102 (A) (5) unless it is so "egregious" and "flagrantly violative of accepted professional norms" as to "undermine the legitimacy of the judicial process." *Matter of the Discipline of Two Attorneys*, *supra* at 628, 629. Accord *In re Gadbois*, 173 Vt. 59, 67-68 (2001) (adopting "conduct flagrantly violative of accepted professional norms" test).

Bar counsel reads *Matter of the Discipline of Two Attorneys*, *supra*, as permitting sanctions under DR 1-102 (A) (5) for any behavior that "by-pass[es]" judicial oversight. We disagree. The open-ended rule that bar counsel urges conflicts with our holding in *Matter of the Discipline of Two Attorneys, supra.* Moreover, it is so vague as to raise serious due process concerns. The construction of DR 1-102 (A) (5) that bar counsel advances would render potentially sanctionable any attorney communication with any third party during the course of litigation. Due process requires that attorneys, like anyone else, not be subject to laws and rules of potential random application or unclear meaning. See, e.g., *In re Ruffalo*, 390 U.S. 544, 554-556 (1968) (White, J., concurring) ("an attorney [may not be deprived] of the opportunity to practice his profession on the basis of a determination after the fact that conduct is unethical if responsible attorneys would differ in appraising the propriety of that conduct").

We are cognizant of the view that broad, codified language

such as that contained in DR 1-102 (A) (5) can never satisfy due process concerns. See, e.g., Restatement (Third) of the Law Governing Lawyers § 5 comment c (2000) (discussing "risk that a charge using only such language would fail to give fair warning of the nature of the charges to a lawyer respondent . . . and that subjective and idiosyncratic considerations could influence a hearing panel or reviewing court in resolving a charge based only on it"); Comment to Rule 8.4 of the Alaska Rules of Professional Conduct (2003) ("Paragraph [d] of the ABA Rules [the successor to DR 1-102 (A) (5)] was omitted because it is too vague").[18] More persuasive to us is the reasoning of States that have rejected due process challenges of general disciplinary rules on the ground that these ethical rules of the profession "written by and for lawyers . . . need not meet the precise standards of clarity that might be required of rules of conduct for laymen." *Matter of Keiler*, 380 A.2d 119, 126 (D.C. 1977). See *Matter of West*, 805 P.2d 351, 355 (Alaska 1991); *Matter of Anderson*, 247 Kan. 208, 212 (1990), cert. denied, 498 U.S. 1095 (1991); *Charges of Unprofessional Conduct against N.P.*, 361 N.W.2d 386, 394-395 (Minn.), appeal dismissed, 474 U.S. 976 (1985); *In re Discipline of Stuhff*, 108 Nev. 629, 636-637 (1992); *Matter of Holtzman*, 78 N.Y.2d 184, 190-191, cert. denied, 502 U.S. 1009 (1991). Having adopted a cabining construction of DR 1-102 (A) (5) to protect the due process rights of attorneys charged with conduct "prejudicial to the administration of justice," we decline to jettison the rule altogether.[19]

Turning to the merits, we conclude that the board correctly

[18]Hawaii, Kentucky, New Hampshire, North Dakota, and Wisconsin have also omitted Rule 8.4 (d) of the ABA Model Rules of Professional Conduct, although not necessarily due to constitutional concerns. See ABA/BNA Lawyers' Manual on Professional Conduct 101:501 (1998).

[19]Our limiting construction of DR 1-102 (A) (5) and our affirmance of the board's decision make it unnecessary to consider the respondent's assertion that the broader construction sought by bar counsel would infringe his right of free speech and his right to petition the government for grievances under the First Amendment to the United States Constitution or art. 16 of the Declaration of Rights, as amended by art. 77 of the Amendments to the Massachusetts Constitution. It is enough to note here that disciplinary rules may not be applied to such a broad scope of expressive conduct that they impinge on an attorney's legitimate exercise of his or her First Amendment rights, see, e.g., *Gentile* v. *State Bar of Nev.*, 501 U.S. 1030, 1038 (1991); *In re Primus*, 436

declined to find a violation of DR 1-102 (A) (5) in the circumstances of this case. Notably, the board did *not* find that the respondent made any effort to influence the trooper to testify untruthfully or to affect the admissibility of an opinion on which any party to the case was relying. It found that although the respondent realized that his actions were likely to redound to his client's favor at trial, he was motivated at least in part by concerns beyond gaining an immediate tactical advantage. The respondent had a firm conviction, buttressed by his long experience in utilities tort defense, that the trooper was incompetent, and that the trooper's incompetence jeopardized his client's interests. The board found, and no party disputes, that the respondent was particularly concerned that the same "incompetent and hostile" trooper could be assigned to investigate a future incident involving the client, an incident that could well occur sooner rather than later. Like the board, we cannot conclude that the respondent's conduct, however mixed in motive, amounted to the kind of "egregious" interference with the administration of justice inherent in activities that unquestionably violate DR 1-102 (A) (5), "such as bribery, perjury, [or] misrepresentations to a court." *Matter of the Discipline of Two Attorneys*, 421 Mass. 619, 628 (1996).[20]

Nor can we say that the respondent's conduct violated accepted ethical norms of the profession. *Id.* "[W]e must balance the . . . obligation to protect the processes of orderly trial with the attorney's obligation zealously to protect the client's interest. In determining whether [punishment] is justified, we must give due weight to the importance of vigorous advocacy. To do otherwise would chill the less courageous attorney in his efforts to represent his client effectively." *Sussman* v. *Commonwealth*, 374 Mass. 692, 696 (1978) (concerning criminal contempt during criminal trial). Attorneys communicate their clients' legitimate concerns to third parties all the time. That such communication may also reap strategic benefits for the client while

---

U.S. 412, 432 (1978). Conversely, not every restriction on an attorney's speech or actions is constitutionally impermissible. See *Gentile* v. *State Bar of Nev.*, *supra* at 1071-1076.

[20]While the respondent raises vigorous arguments against a number of specific findings, we, like the board, conclude that the committee's findings are supported by the evidence.

disadvantaging the legitimate interests of others at trial does not, in itself, flagrantly transgress professional norms by tainting the administration of justice. Indeed, zealous representation often demands an assertive and adversary approach to the client's legitimate global interests.[21] More generally, we would be loath to punish an attorney who communicates to others non-privileged information obtained in litigation that the attorney believes will be used to correct a hazardous, illegal, or otherwise improper situation.[22] Here, the respondent's conduct violated no specific statute, rule, order, regulation, or established norm of professional conduct. It did not bear on the outcome of the hard-fought underlying civil litigation.[23] It was a one-time occurrence. It did not involve bribery, corruption, or an attempt to induce false testimony. Viewed in its entirety, the respondent's act of sending the trooper's deposition transcript to the fire marshal's office did not "undermine[] the legitimacy of the judicial processes" in the manner contemplated by DR 1-102 (A) (5). *Matter of the Discipline of Two Attorneys, supra* at 628, quoting *Florida Bar* v. *Pettie*, 424 So. 2d 734, 737-738 (Fla. 1983).

This is not to say that we condone all aspects of the respondent's course of action. We do not. While the respondent had a legitimate basis for bringing his concerns to the immediate attention of the trooper's supervisor, the manner of that communication could have — and should have — been handled in a more prudent fashion. As the respondent himself acknowl-

---

[21]The additional motivation the board attributed to the respondent — protecting his client's good working relationship with the fire marshal's office — is legitimate and proper. Indeed, the fire marshal's ability to conduct fair and informed fire investigations clearly is in a gas utility company's, and the public's, interest.

[22]Most would agree with amici that an attorney who obtains from discovery nonconfidential information that gives rise to concerns about police misconduct or a threat to public safety should convey the information to a person capable of promptly correcting the situation, and that for the attorney to withhold the information for any length of time would be regrettable. We will not employ the disciplinary rules in a manner that effectively discourages responsible behavior.

[23]The plaintiffs in the case had not adopted the trooper's reported causation theory, and there is no indication from the record that any party relied on the trooper's opinion testimony. The case never went to trial; the parties reached a confidential settlement following mediation.

edges, he should have communicated his urgent concerns about the trooper's temperament and competence in writing to the fire marshal's office, rather than through the investigator's conversation with the supervisor. He should have informed counsel for the other parties both that he had done so and why, which could have been accomplished by the simple expedient of providing counsel with a copy of the written communication. The letter could have made it abundantly clear that the respondent was acting to preserve his client's longer-term interests and not to affect the litigation improperly. But, where careful lawyering would have counselled openness and specificity, the respondent opted to proceed in an indirect manner that left his motives open to interpretation. The result was nearly one decade of disruptive and costly disputation with bar counsel.[24]

There is a suggestion in the hearing committee's report that the respondent should have availed himself of judicial process to address his concerns once the deposition had concluded. But the respondent's concerns for his client were grave and immediate, and existed apart from the litigation. In this case, the record indicates that the trooper's deposition in the underlying litigation did not resume until almost two years after it was suspended, a period during which the trooper could have been assigned to investigate other matters concerning the client. We do not deny that the respondent might have availed himself of the court's protection to counter the trooper's testimony at the trial level, as the hearing committee concluded. But as the hear-

---

[24]Because the respondent has maintained a national practice, he has relied on pro hac vice admissions in States where he is not otherwise admitted to practice. Obtaining these admissions typically requires an attorney to submit certificates of good standing from State bars to which he or she is formally admitted. In this case, it appears that the respondent was able to obtain certificates of good standing during the pendency of this matter, but, ever since the inquiry began in December, 1996, such certificates have contained a qualifying notation that matters are pending against him. See S.J.C. Rule 4:01, § 20 (2) (d), as amended by 415 Mass. 1307 (1993), and as appearing in 425 Mass. 1327 (1997), which provides in pertinent part that "bar counsel or the Board may disclose the pendency, subject matter, and status of an investigation if . . . there is a need to notify another person or organization in order to protect the public, the administration of justice, or the legal profession." Moreover, the respondent estimates that defending this matter has cost him approximately $125,000.

ing committee concluded, the respondent's legitimate concerns went beyond those of the case at hand.

4. *G. L. c. 231, § 59H.*[25] Lastly, we consider the respondent's motion to dismiss under the anti-SLAPP statute. As we noted in *Duracraft Corp.* v. *Holmes Prods. Corp.*, 427 Mass. 156, 164 (1998), where we examined the legislative history of G. L. c. 231, § 59H, "SLAPPs are by definition meritless suits." *Id.*, quoting Barker, Common Law and Statutory Solutions to the Problems of SLAPPs, 26 Loy. L.A. L. Rev. 395, 399 (1993). "The objective of SLAPP suits is not to win them, but to use litigation to intimidate opponents' exercise of rights of petitioning and speech." *Duracraft Corp.* v. *Holmes Prods. Corp.*, *supra* at 161, citing *Wilcox* v. *Superior Court*, 27 Cal. App. 4th 809, 816-817 (1994). However, we recognize that, because the Massachusetts anti-SLAPP statute "makes no provision for a plaintiff to show that its own claims are not frivolous," *Duracraft Corp.* v. *Holmes Prods. Corp.*, *supra* at 165, the statute could be misused to allow motions for expedited dismissal of nonfrivolous claims in contravention of the Legislature's intent. To address this concern, we adopted a construction of the statute that would prevent dismissal of suits raising "meritorious claims with a substantial basis other than or in addition to the petitioning activities implicated." *Id.* at 167.

Assuming without deciding both that the respondent's conduct was protected petitioning activity within the meaning of the statute,[26] and that the anti-SLAPP statute applies to bar

---

[25]In reporting this case to the full court, the single justice implicitly ruled against the respondent's pleas for a stay of proceedings and expedited dismissal contained in the motion. Although our decision effectively makes these issues moot, the plea for attorney's fees and costs remains before us.

[26]General Laws c. 231, § 59H, defines the right of petition as "any written or oral statement . . . made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other governmental proceeding; [or] any statement reasonably likely to encourage consideration or review of an issue by a legislative, executive, or judicial body or any other governmental proceeding; [or] any statement reasonably likely to enlist public participation in an effort to effect such consideration." We decline to construe this right so as to immunize every written or oral statement made by an attorney in connection with an issue being litigated in a civil suit because such a broad reading would preclude enforcement of many attorney conduct rules.

discipline cases,[27] we nevertheless conclude that the respondent has failed to show that bar counsel lacked a "substantial basis other than or in addition to the petitioning activit[y]" for bringing this action. *Id.* Indeed, bar counsel sought to sanction the respondent for "conduct that is prejudicial to the administration of justice," an undoubtedly meritorious charge if a witness had been influenced by improper means. Bar counsel's objective was not "to intimidate [the respondent's] exercise of rights of petitioning and speech,"[28] *id.* at 161, but to discipline the respondent for what bar counsel saw as an inappropriate attempt to influence a witness's testimony. As discussed above, the less than careful means of communication employed by the respondent left his conduct at least open to the interpretation urged by bar counsel, and bar counsel thus had a "substantial basis" for bringing the disciplinary action. For this reason, we hold that the anti-SLAPP statute does not apply to the actions in this case, and we deny the respondent's request for attorney's fees and costs.[29]

A judgment shall be entered in the county court affirming the decision of the board and denying the respondent's special motion to dismiss.

*So ordered.*

---

[27]Bar counsel asserts that the anti-SLAPP statute does not apply to bar discipline cases because, by its terms, the statute applies only to "civil claims" and bar discipline cases are not civil claims. Bar counsel also asserts that the statute does not apply to bar discipline cases because the statute would interfere with this court's exercise of its "ultimate authority" over attorneys. *Marino* v. *Tagaris*, 395 Mass. 397, 401 (1985). Because we conclude that the anti-SLAPP statute does not apply to this case on other grounds, we need not resolve these issues.

[28]Both the hearing committee and the board rejected the respondent's contention that bar counsel initiated disciplinary proceedings to retaliate for the respondent's past criticism of the board.

[29]On March 11, 2004, the respondent moved to strike portions of bar counsel's brief. Because our decision does not rest on the challenged portions of the brief, we need not consider the motion.